

**FELONY**

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

### INDICTMENT FOR WIRE FRAUD AND FALSE STATEMENTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. **24-165** |
| v. | * | SECTION: **SECT. D MAG. 5** |
| JEFFREY PAUL VAPPIE, II | * | VIOLATIONS: 18 U.S.C. § 1001(a)(2) |
| | | 18 U.S.C. § 1343 |
| | * | |
| | * | |
| * * * | | |

The Grand Jury charges that:

### COUNTS 1 – 7
(18 U.S.C. § 1343 – Wire Fraud)

**A.    AT ALL TIMES MATERIAL HEREIN:**

*Background*

1.    The New Orleans Police Department (NOPD) was an agency of the City of New Orleans, a local government/municipality within the State of Louisiana, located in the Eastern District of Louisiana. NOPD was the primary local law enforcement agency for the City of New Orleans and divided its operations geographically into eight field operations districts.

```
___Fee_____
___Process____
 X  Dktd_____
___CtRmDep____
___Doc.No.____
```

2. NOPD fell under the authority of the Superintendent. The Superintendent served at the pleasure of the Mayor of the City of New Orleans (the Mayor).

3. Since about January 2023, after the position of Superintendent became vacant, the Mayor had authority to nominate a new Superintendent, subject to confirmation by the New Orleans City Council.

4. The Orleans Parish Sheriff's Office (OPSO) was an agency of the City of New Orleans.

5. The City of New Orleans owned an apartment, Unit 530B, in the Pontalba Building in the French Quarter neighborhood of New Orleans, Louisiana (the Pontalba Apartment).

6. Until about March 2024, the Mayor had access to the Pontalba Apartment.

### The Executive Protection Unit (EPU)

7. The City of New Orleans employed an Executive Protection Unit (EPU) for the purpose of providing security and risk mitigation measures for select high-ranking City of New Orleans officials.

8. Approximately four members of EPU, each of whom was a law enforcement officer employed by NOPD or OPSO, provided protection for the Mayor. They were split into two teams (Team A and Team B) of two members each.

9. The two EPU teams were organized to provide protection for the Mayor on a preset, rotating schedule.

10. EPU members assigned to provide protection for the Mayor had no assignments other than those associated with EPU.

11. The Mayor's EPU personnel provided protection for the Mayor's person when the Mayor was away from the Mayor's place of residence.

12. EPU did not typically provide personal protection for the Mayor when the Mayor was at the location at which the Mayor was residing (*i.e.*, when the Mayor did not leave home during the day or after the Mayor returned to the Mayor's residence at the end of a workday), except when extenuating circumstances, such as a viable threat, existed.

13. EPU was not responsible for protecting the personal residence of the Mayor.

14. In the course of their duties, EPU members rarely entered the Mayor's residence other than to provide assistance to the Mayor or undertake a security sweep of the premises. On such occasions, EPU members only spent a brief period inside the Mayor's residence.

15. Not later than mid-2022, EPU members treated the Pontalba Apartment in a manner similar to the Mayor's personal residence, including not performing a security sweep of the Pontalba Apartment before the Mayor entered it and not providing protection for the Mayor while the Mayor was inside the Pontalba Apartment.

16. EPU members were paid biweekly by the City of New Orleans at regular and overtime hourly rates.

17. Members of EPU submitted their individual time worked to an NOPD Sergeant on a regular basis.

18. The information NOPD officers, including EPU members, provided regarding their hours worked was compiled into an electronic biweekly timecard that included, among other things, the date, beginning time, ending time, and duration of all shifts each officer claimed to work in the given period.

19. NOPD relied on the contents of certified timecards to determine the amount it paid EPU members.

### *NOPD Policies*

20. NOPD officers had rules and policies regarding their lawful and official duties, including the following:

   a. NOPD officers were required to ensure that their timecards accurately reflected their actual work hours.

   b. NOPD employees were required to report for duty at the time and place required by assignment, to devote their entire shift to duty, and "not engage in activities or personal business which would cause them to neglect or be inattentive to duty." In the event an officer was unable to perform or to begin punctually, the officer was required to notify the commanding officer, or a member of the unit authorized to receive such information before the start of the shift.

   c. NOPD employees were required to perform their duties throughout that shift, and were prohibited from ceasing to perform their duties before the end of the shift, unless they received prior approval from their supervisor.

   d. NOPD employees were prohibited from using their position for personal or financial gain.

   e. NOPD employees were prohibited from drinking intoxicating beverages while on duty, except in the performance of duty and while acting under proper and specific orders from a superior officer, such as during an undercover operation.

   f. NOPD employees were prohibited from supervising, occupying a position in the line of supervision, or being directly supervised by any other employee "with whom they are involved in a personal or business relationship."

*Defendant Jeffrey Paul Vappie, II*

21. **JEFFREY PAUL VAPPIE, II (VAPPIE)** was an adult resident of Orleans Parish.

22. **VAPPIE** was employed as an officer with NOPD from on or about April 1997 to on or about June 29, 2024. In about August 2023, **VAPPIE** was promoted to the rank of Senior Police Officer.

23. **VAPPIE** maintained financial accounts at JPMorgan Chase Bank, N.A. (Chase) bearing account number x1877 and account number x8514. **VAPPIE** received payments from his work with NOPD via direct deposit into the Chase accounts bearing account number x1877 and account number x8514.

24. **VAPPIE** was assigned to serve as a member of EPU from on or about May 23, 2021, to on or about November 9, 2022, and again from on or about June 22, 2023, to on or about April 22, 2024.

25. **VAPPIE** attended trainings concerning best practices, techniques, and ethics when providing protection, security, and risk mitigation measures.

*Public Official 1*

26. On or about November 18, 2017, Public Official 1 was elected to serve a four-year term as Mayor of the City of New Orleans.

27. On or about November 13, 2021, Public Official 1 was elected to serve a second, and final, four-year term as Mayor of the City of New Orleans.

28. During Public Official 1's tenure as Mayor, Public Official 1 received city-paid protection from EPU.

29. Typically, on the preceding afternoon or evening, a member of Public Official 1's staff circulated a document via email containing Public Official 1's schedule and the members of

5

EPU that would be on duty for Public Official 1 the next day. The email recipients included Public Official 1, members of EPU, and various members of the Public Official 1's staff.

30. On or about March 22, 2022, Public Official 1 appointed **VAPPIE** to serve as a member of the Housing Authority of New Orleans (HANO) Board of Commissioners.

### *Vappie's Time and Travel with Public Official 1*

31. Between in or around September 2021 and in or around March 2024, while purporting to serve on-duty as a member of EPU, **VAPPIE** accompanied Public Official 1 on at least fourteen (14) trips outside the State of Louisiana, including to domestic destinations such as Los Angeles, California, San Francisco, California, and Washington, D.C., and international destinations such as Scotland and the United Arab Emirates.

32. The City of New Orleans incurred more than $47,000 in costs related to **VAPPIE's** purported work-related trips outside the State of Louisiana with Public Official 1, including travel, lodging, meals, incidentals, and salary.

33. Between on or about August 2, 2022, and on or about October 22, 2022:

   a. Public Official 1 was in New Orleans on approximately sixty-two (62) days;

   b. **VAPPIE** was paid for being on duty for EPU while he was in New Orleans on approximately fifty-one (51) days; and

   c. **VAPPIE** spent time with Public Official 1 inside the Pontalba Apartment during periods **VAPPIE** purported to be on duty for EPU on approximately twenty-five (25) days.

### *Public Scrutiny and Discipline*

34. On or about November 9, 2022, local New Orleans media outlets first published and broadcast reports regarding **VAPPIE** and his frequent and lengthy presence inside the Pontalba Apartment with Public Official 1.

35. **VAPPIE** was removed from EPU and reassigned to another position with NOPD from on or about November 9, 2022, until on or about June 22, 2023.

36. On or about June 15, 2023, the Interim Superintendent of the New Orleans Police Department formally sustained the findings of an internal investigation concerning **VAPPIE's** conduct as a member of EPU. Shortly before doing so, the Interim Superintendent notified Public Official 1 of the Interim Superintendent's intent to sustain the proposed findings.

37. Shortly after sustaining the internal investigation findings, acting at the direction of Public Official 1, the Interim Superintendent reassigned **VAPPIE** back to EPU.

38. On or about September 11, 2023, Public Official 1 informed the Interim Superintendent during an in-person meeting that the Interim Superintendent would not become the permanent Superintendent of the New Orleans Police Department. **VAPPIE** attended the meeting.

39. On or about September 22, 2023, the Interim Superintendent's tenure ended.

40. On or about April 24, 2024, **VAPPIE** was removed again from EPU and reassigned to another position with NOPD.

41. On or about June 29, 2024, **VAPPIE** resigned from NOPD.

**B.   THE SCHEME AND ARTIFICE TO DEFRAUD:**

Beginning at a time unknown, but not later than in about November 2021, and continuing at least through on or about April 26, 2024, in the Eastern District of Louisiana and elsewhere, **JEFFREY PAUL VAPPIE, II** did knowingly devise and intend to devise a scheme and artifice

7

to defraud and obtain money and property by means of false and fraudulent pretenses, representations, and promises, namely, submitting false timecards to NOPD and thereafter receiving unearned and excessive payments as a result of those submissions.

## C. MANNER AND MEANS:

It was part of the scheme and artifice to defraud that beginning not later than about November 2021, **VAPPIE** and Public Official 1 carried on a personal, romantic relationship, which **VAPPIE** attempted to disguise by making his interactions with Public Official 1 appear to relate to **VAPPIE's** duties and responsibilities as a member of EPU assigned to provide personal protection to Public Official 1.

It was further part of the scheme and artifice to defraud that **VAPPIE** submitted and certified timecards to NOPD for periods he falsely claimed to have worked on duty, including during the date ranges referenced in Counts 1 through 7, when, in fact, **VAPPIE** was engaged in personal, recreational activities unrelated to his work duties, including a personal and romantic relationship with Public Official 1.

It was further part of the scheme and artifice to defraud that, when asked by fellow EPU members, **VAPPIE** denied his involvement in a personal or romantic relationship with Public Official 1.

It was further part of the scheme and artifice to defraud that **VAPPIE** and Public Official 1 exchanged personal and romantic messages and photographs via text message, voice message, and WhatsApp, a secure, end-to-end encrypted instant messaging application, to avoid detection and continue their relationship while **VAPPIE** continued to claim only a professional relationship with Public Official 1 and serve as a member of EPU.

It was further part of the scheme and artifice to defraud that **VAPPIE** and Public Official 1 discussed deleting, and did delete, unencrypted messages they exchanged.

It was further part of the scheme and artifice to defraud that **VAPPIE** arranged to be appointed by Public Official 1 to the HANO Board of Commissioners and participate in HANO meetings during his on-duty shifts with EPU.

It was further part of the scheme and artifice to defraud that **VAPPIE** and Public Official 1 ate meals and consumed alcohol together at restaurants during periods **VAPPIE** claimed to be working as a member of EPU.

It was further part of the scheme and artifice to defraud that **VAPPIE**, while purporting to be working as a member of EPU, accompanied Public Official 1 to domestic and international destinations outside the State of Louisiana, the costs of which were paid for by the City of New Orleans.

It was further part of the scheme and artifice to defraud that on or about March 3, 2022, **VAPPIE** conducted multiple online searches regarding an alleged affair involving the former mayor of Nashville, Tennessee, and a member of her security detail and the subsequent criminal prosecution of both the Nashville mayor and the security detail member.

It was further part of the scheme and artifice to defraud that, soon after the news media began publishing and broadcasting reports regarding **VAPPIE** and his frequent, lengthy presence inside the Pontalba Apartment, on or about November 12, 2022, **VAPPIE** conducted an online search for "[H]ow secure is whatsapp[.]"

It was further part of the scheme and artifice to defraud that on or about March 19, 2023, after a local news media outlet broadcast additional reports about **VAPPIE's** work on EPU and relationship with Public Official 1, **VAPPIE** conducted multiple online searches concerning a

member of the news media who reported about **VAPPIE**, including "Where does [Member of News Media 1] live[.]"

It was further part of the scheme and artifice to defraud that in or around late May or early June 2023, after **VAPPIE** had a disciplinary hearing regarding an administrative investigation concerning his submission of timecards for purportedly working on EPU, **VAPPIE** attempted to influence the Interim Superintendent into exonerating him by contacting the Interim Superintendent and telling the Interim Superintendent that this was the Interim Superintendent's opportunity to "make it right" when the Interim Superintendent reviewed the file and rendered a decision on whether to censure **VAPPIE**.

It was further part of the scheme and artifice to defraud that **VAPPIE** was present for, and participated in, the September 11, 2023 meeting at which Public Official 1 told the Interim Superintendent that Public Official 1 would not nominate the Interim Superintendent to serve as the permanent Superintendent of the New Orleans Police Department.

It was further part of the scheme and artifice to defraud that after the meeting, **VAPPIE** contacted the Interim Superintendent and invited the Interim Superintendent to a daiquiri shop to discuss the Interim Superintendent's recent demotion and mitigate the Interim Superintendent's disappointment.

### D. THE OFFENSE:

On or about the dates listed below, in the Eastern District of Louisiana and elsewhere, **JEFFREY PAUL VAPPIE, II**, for the purpose of executing and attempting to execute the aforesaid scheme and artifice to defraud and to obtain money, funds and property by means of false and fraudulent pretenses, representations and promises, did knowingly transmit and cause to be transmitted in interstate commerce certain writings, signs, signals and sounds by means of wire

communications, namely causing electronic fund transfers into a bank account under **VAPPIE's** control that included the following amounts as a result of false and fraudulent timecards he caused to be submitted to NOPD:

| Count | Payment Date | Description |
|---|---|---|
| 1 | August 19, 2022 | **VAPPIE** received payment via electronic direct deposit into Chase Account No. x1877 that included:<br>• approximately $335.00 for claiming to be on duty on or about August 2, 2022, from about 7:00 a.m. to 7:00 p.m.,<br>• approximately $237.93 for claiming to be on duty on or about August 3, 2022, from about 6:25 a.m. to 3:00 p.m.,<br>• approximately $335.00 for claiming to be on duty on or about August 5, 2022, from about 7:00 a.m. to 7:00 p.m.,<br>• approximately $420.24 for claiming to be on duty on or about August 6, 2022, from about 7:00 a.m. to 10:00 p.m.,<br>• approximately $335.00 for claiming to be on duty on or about August 8, 2022, from about 8:00 a.m. to 8:00 p.m.<br>• approximately $335.00 for claiming to be on duty on or about August 9, 2022, from about 8:00 a.m. to 8:00 p.m., and<br>• approximately $335.00 for claiming to be on duty on or about August 11, 2022, from about 9:00 a.m. to 9:00 p.m., and<br>• approximately $335.00 for claiming to be on duty on or about August 12, 2022, from about 8:00 a.m. to 8:00 p.m. |
| 2 | September 2, 2022 | **VAPPIE** received payment via electronic direct deposit into Chase Account No. x1877 that included:<br>• approximately $335.00 for claiming to be on duty on or about August 16, 2022, from about 9:00 a.m. to 9:00 p.m.<br>• approximately $335.00 for claiming to be on duty on or about August 18, 2022, from about 9:00 a.m. to 9:00 p.m.<br>• approximately $335.00 for claiming to be on duty on or about August 19, 2022, from about 8:00 a.m. to 8:00 p.m., and |

| Count | Payment Date | Description |
|---|---|---|
| | | • approximately $335.00 for claiming to be on duty on or about August 25, 2022, from about 9:00 a.m. to 9:00 p.m. |
| 3 | September 16, 2022 | VAPPIE received payment via electronic direct deposit into Chase Account No. x1877 that included:<br>• approximately $362.47 for claiming to be on duty on or about September 2, 2022, from about 8:00 a.m. to 8:00 p.m.,<br>• approximately $335.00 for claiming to be on duty on or about September 3, 2022, from about 8:00 a.m. to 8:00 p.m.,<br>• approximately $335.00 for claiming to be on duty on or about September 4, 2022, from about 7:00 a.m. to 7:00 p.m.,<br>• approximately $335.00 for claiming to be on duty on or about September 7, 2022, from about 8:00 a.m. to 8:00 p.m.,<br>• approximately $391.83 for claiming to be on duty on or about September 8, 2022, from about 8:00 a.m. to 10:00 p.m., and<br>• approximately $335.00 for claiming to be on duty on or about September 9, 2022, from about 8:00 a.m. to 8:00 p.m. |
| 4 | October 11, 2022 | VAPPIE received payment via electronic direct deposit into Chase Account No. x1877 that included approximately $335.00 for claiming to be on duty on or about September 26, 2022, from about 8:00 a.m. to 8:00 p.m. |
| 5 | October 28, 2022 | VAPPIE received payment via electronic direct deposit into Chase Account No. x1877 that included approximately $335.00 for claiming to be on duty on or about October 18, 2022, from about 8:00 a.m. to 8:00 p.m. |
| 6 | April 12, 2024 | VAPPIE received payment via electronic direct deposit into Chase Account No. x8514 that included approximately $370.01 for claiming to be on duty on or about March 28, 2024, from about 8:00 a.m. to 8:00 p.m. |

| 7 | April 26, 2024 | **VAPPIE** received payment via electronic direct deposit into Chase Account No. x8514 that included approximately $370.01 for claiming to be on duty on or about April 7, 2024, from about 8:00 a.m. to 8:00 p.m. |

All in violation of Title 18, United States Code, Section 1343.

## COUNT 8
(18 U.S.C. § 1001(a)(2) – False Statements)

A. **AT ALL TIMES MATERIAL HEREIN:**

1. The allegations of Counts 1 through 7 are hereby realleged and incorporated herein in their entirety by reference.

2. The Federal Bureau of Investigation was an agency within the United States Department of Justice, which was a Department within the Executive Branch of the Government of the United States.

3. On or about March 31, 2022, **VAPPIE** conducted an online search for "[W]hat was Whitney Houston's character name in The Bodyguard[?]"[1]

---

[1] "The Bodyguard" was a 1992 romantic drama starring Kevin Costner and Whitney Houston in which a male bodyguard (played by Costner) was hired to protect a female celebrity (played by Houston). After initial attempts to remain professional, the bodyguard and the celebrity engaged in a romantic relationship, during which the bodyguard attempted to break off the affair because he realized it compromised his ability to protect the celebrity.

13

4. On or about June 21, 2022, **VAPPIE** and Public Official 1 exchanged the following image:



5. **VAPPIE** and Public Official 1 exchanged numerous voice messages, including on September 25, 2022, September 29, 2022, and October 3, 2022, in which **VAPPIE** and Public Official 1 each utilized romantic terms of endearment and expressed their love, attraction, and affection for the other.

6. On or about July 14, 2023, special agents with the Federal Bureau of Investigation interviewed **VAPPIE** at his residence in New Orleans, Louisiana, for over one hour.

14

B.  **THE OFFENSE:**

On or about July 14, 2023, in the Eastern District of Louisiana, the defendant, **JEFFREY PAUL VAPPIE, II**, did willfully and knowingly make and cause to be made materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of a department or agency of the United States by stating to an agent of the Federal Bureau of Investigation, an agency of the United States government, that **VAPPIE** did not have, and had never had, a physical relationship or a romantic relationship with Public Official 1, that **VAPPIE** had never kissed Public Official 1, and that **VAPPIE** had never told Public Official 1 that **VAPPIE** loved Public Official 1; these statements and representations were false because, as the defendant, **JEFFREY PAUL VAPPIE, II**, then and there knew, since at least November 2021, **VAPPIE** had been in a romantic relationship and a physical relationship with Public Official 1, **VAPPIE** had kissed Public Official 1, and **VAPPIE** had told Public Official 1 that **VAPPIE** loved Public Official 1, in violation of Title 18, United States Code, Section 1001(a)(2).

## NOTICE OF FORFEITURE

1. The allegations of Counts 1 through 7 of this Indictment are incorporated by reference as though set forth fully herein for the purpose of alleging forfeiture to the United States.

2. As a result of the offenses alleged in Counts 1 through 7, the defendant, **JEFFREY PAUL VAPPIE, II**, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to said offenses.

3. If any of the above-described property, as a result of any act or omission of the defendant:

  a. cannot be located upon the exercise of due diligence;

  b. has been transferred or sold to, or deposited with, a third person;

  c. has been placed beyond the jurisdiction of the Court;

  d. has been substantially diminished in value; or

  e. has been commingled with other property which cannot be subdivided without difficulty;

the United States shall seek a money judgment and, pursuant to Title 21, United States Code, Section 853(p), forfeiture of any other property of the defendant up to the value of said property.

A TRUE BILL:

[signature redacted]

FOREPERSON

DUANE A. EVANS
UNITED STATES ATTORNEY

*/s/ Jordan Ginsberg*
JORDAN GINSBERG
Assistant United States Attorney

*/s/ Nicholas D. Moses*
NICHOLAS D. MOSES
Assistant United States Attorney

New Orleans, Louisiana
July 19, 2024

16

FORM OBD-34

No. _____

# UNITED STATES DISTRICT COURT

Eastern _____ District of _____ Louisiana

_____ Criminal _____ Division

THE UNITED STATES OF AMERICA

vs.

JEFFREY PAUL VAPPIE, II

## INDICTMENT FOR WIRE FRAUD AND FALSE STATEMENTS

VIOLATIONS: 18 U.S.C. § 1001(a)(2)
18 U.S.C. § 1343

A true bill.

▬▬▬▬▬▬▬▬▬▬

Filed in open court this _____ day of _____ A.D. 2024.

_____
Clerk

Bail, $ _____

_JORDAN S. GINSBERG_
Assistant United States Attorney