FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA
2025AUG15 PM0116    *C C*
CAROL L. MICHEL, CLERK

# FELONY

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

### SUPERSEDING INDICTMENT FOR CONSPIRACY TO COMMIT WIRE FRAUD, WIRE FRAUD, CONSPIRACY TO OBSTRUCT JUSTICE, OBSTRUCTION OF JUSTICE, FALSE STATEMENTS, AND FALSE DECLARATIONS BEFORE GRAND JURY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 24-165 |
| v. | * | SECTION: "D" |
| JEFFREY PAUL VAPPIE, II | * | VIOLATIONS: 18 U.S.C. § 371 |
| LATOYA CANTRELL | | 18 U.S.C. § 1343 |
| | * | 18 U.S.C. § 1512(c)(1) |
| | | 18 U.S.C. § 1512(c)(2) |
| | * | 18 U.S.C. § 1512(k) |
| | | 18 U.S.C. § 1001(a)(2) |
| | * | 18 U.S.C. § 1623 |

*    *    *

The Grand Jury charges that:

### COUNT 1
(18 U.S.C. § 371 – Conspiracy)

**A.    AT ALL TIMES MATERIAL HEREIN:**

*Overview*

1.    The Defendant, **LATOYA CANTRELL (CANTRELL)**, was the Mayor of the City of New Orleans.  She was elected to serve a four-year term in November 2017, and was reelected in November 2021, to serve a second four-year term.

_____ Fee _____
_____ Process _____
_X_ Dktd _____
_____ CtRmDep _____
_____ Doc. No. _____

2.      As Mayor, **CANTRELL** received physical protection from the New Orleans Police Department's Executive Protection Unit.   The Defendant, **JEFFREY PAUL VAPPIE, II (VAPPIE)**, served as a member of the Executive Protection Unit and was assigned to provide protection for **CANTRELL** from on or about May 23, 2021, to on or about November 9, 2022, and again from on or about June 22, 2023, to on or about April 22, 2024.

3.      In or around October 2021, **CANTRELL** and **VAPPIE** developed a personal and intimate relationship.   To hide their relationship from detection and to maximize their time together, **CANTRELL** and **VAPPIE** exploited their public positions to develop and implement a scheme to defraud the City of New Orleans and the New Orleans Police Department by engaging in personal activities while **VAPPIE** claimed to be on duty, and was paid for, providing protection for **CANTRELL**.

4.      As part of their scheme, **CANTRELL** and **VAPPIE** arranged for **VAPPIE** to accompany **CANTRELL** when she traveled outside the State of Louisiana on official business. **CANTRELL** falsely claimed she needed protection from members of the Executive Protection Unit while travelling due to safety concerns.  **CANTRELL** and **VAPPIE** orchestrated out-of-state trips to maximize their opportunities to engage in personal activities.  In total, **VAPPIE's** trips with **CANTRELL** cost the City of New Orleans over $70,000, separate from **CANTRELL's** own travel costs.

5.      Aware their conduct violated rules, policies, and criminal laws, **CANTRELL** and **VAPPIE** attempted to distract and impede inquiries and investigations, including a federal grand jury investigation, about the true nature and circumstances of their relationship and their scheme to defraud. They did this by using an encrypted messaging platform, intimidating and punishing subordinates, lying to colleagues and advisors, making false public pronouncements, harassing a

private individual who took pictures of them in public together, deleting electronic evidence, making false statements to federal law enforcement agents, authoring an affidavit signed under oath and penalty of perjury containing false information, and testifying falsely while under oath before a federal grand jury.

### *The Executive Protection Unit (EPU)*

6.      The New Orleans Police Department (NOPD) was an agency of the City of New Orleans, a local government/municipality within the State of Louisiana, located in the Eastern District of Louisiana. NOPD was the primary local law enforcement agency for the City of New Orleans and divided its operations geographically into eight districts. NOPD fell under the authority of the Superintendent. The Superintendent served at the pleasure of the Mayor of the City of New Orleans (the Mayor).

7.      The Orleans Parish Sheriff's Office (OPSO) was a law enforcement entity in the City of New Orleans.

8.      The City of New Orleans employed an Executive Protection Unit (EPU) for the purpose of providing security and risk mitigation for select high-ranking City of New Orleans officials.

9.      Approximately four members of EPU, each of whom was a law enforcement officer employed by NOPD or OPSO, provided protection for the Mayor. They were split into two teams (Team A and Team B) of two members each.

10.      The two EPU teams were organized to provide protection for the Mayor on a preset, rotating schedule.

11.      EPU members assigned to provide protection for the Mayor worked on EPU assignments exclusively.

3

12.    The Mayor's EPU personnel provided protection for the Mayor when the Mayor was away from the Mayor's place of residence.

13.    EPU did not typically provide personal protection for the Mayor when the Mayor was at the location at which the Mayor was residing (*i.e.*, when the Mayor did not leave home during the day or after the Mayor returned to the Mayor's residence at the end of a workday), except when extenuating circumstances, such as a viable threat, existed.

14.    EPU did not typically protect the residence of the Mayor when the Mayor was elsewhere.

15.    In the course of their duties, EPU members rarely entered the Mayor's residence. On such occasions, EPU members only spent a brief period inside the Mayor's residence. Even when extenuating circumstances arose, EPU remained outside the Mayor's residence when providing protection.

16.    EPU members were paid biweekly by the City of New Orleans at regular and overtime hourly rates.

17.    Members of EPU employed by NOPD submitted their individual time worked to an NOPD sergeant on a regular basis.

18.    The information NOPD officers, including EPU members, provided regarding their hours worked was compiled into an electronic biweekly timecard that included, among other things, the date, beginning time, ending time, and duration of all shifts each officer claimed to work in the given period.

19.    NOPD relied on the contents of certified timecards to determine the amount it paid EPU members.

4

20.    When an EPU member traveled on official business, he was eligible to receive a daily allowance for meals and incidental expenses. After returning from a trip, the EPU member completed a travel expense form and submitted it to the Mayor for review and approval. After the Mayor approved a travel expense form, the City of New Orleans issued payment to the EPU member.

### *NOPD Policies*

21.    NOPD officers had rules and policies regarding their lawful and official duties, including the following:

    a.    NOPD employees were required to ensure that their timecards accurately reflected their actual work hours.

    b.    NOPD employees were required to report for duty at the time and place required by assignment, to devote their entire shift to duty, and "not engage in activities or personal business which would cause them to neglect or be inattentive to duty." In the event an officer was unable to perform or to begin punctually, the officer was required to notify the commanding officer, or a member of the unit authorized to receive such information, before the start of the shift.

    c.    NOPD employees were required to perform their duties throughout their shift and were prohibited from ceasing to perform their duties before the end of the shift, unless they received prior approval from their supervisor.

    d.    NOPD employees were prohibited from using their position for personal or financial gain.

e.  NOPD employees were prohibited from drinking intoxicating beverages while on duty, except in the performance of duty and while acting under proper and specific orders from a superior officer, such as during an undercover operation.

f.  NOPD employees were prohibited from supervising, occupying a position in the line of supervision, or being directly supervised by any other employee "with whom they are involved in a personal or business relationship."

### ***Defendant Jeffrey Paul Vappie, II***

22.    **VAPPIE** was an adult resident of Orleans Parish.

23.    **VAPPIE** was employed as an officer with NOPD from in or around April 1997 to on or about June 29, 2024.  In or around August 2023, **VAPPIE** was promoted to the rank of Senior Police Officer.

24.    **VAPPIE** maintained financial accounts at JPMorgan Chase Bank, N.A. (Chase) bearing account number x1877 and account number x8514.  **VAPPIE** received payments from his work with NOPD via direct deposit into the Chase accounts bearing account number x1877 and account number x8514.

25.    **VAPPIE** was assigned to serve as a member of EPU from on or about May 23, 2021, to on or about November 9, 2022.  **VAPPIE** was injured, unable to work, and placed on sick leave from on or about May 18, 2022, to on or about July 19, 2022.

26.    **VAPPIE** was again assigned to serve as a member of EPU from on or about June 22, 2023, to on or about April 22, 2024.

27.    **VAPPIE** attended trainings concerning best practices, techniques, and ethics when providing protection, security, and risk mitigation.

6

### *Defendant LaToya Cantrell*

28.     On or about November 18, 2017, **CANTRELL** was elected to serve a four-year term as Mayor of the City of New Orleans.

29.     On or about November 13, 2021, **CANTRELL** was elected to serve a second, and final, four-year term as Mayor of the City of New Orleans.

30.     During **CANTRELL's** tenure as Mayor, **CANTRELL** received city-paid protection from EPU.

31.     Typically, on the preceding afternoon or evening, a member of **CANTRELL's** staff circulated a document via email containing **CANTRELL's** schedule and the members of EPU that would be on duty for **CANTRELL** the next day.  The email recipients included **CANTRELL**, members of EPU, and various members of **CANTRELL's** staff.

32.     On or about March 22, 2022, **CANTRELL** appointed **VAPPIE** to serve as a member of the Housing Authority of New Orleans (HANO) Board of Commissioners.

### *Personal Correspondence Between Cantrell and Vappie*

33.     WhatsApp was a free, end-to-end encrypted cellular phone messaging application that allowed users to send text, voice messages, and video messages, make voice and video calls, and share images, documents, user locations, and other content.  WhatsApp was known for its security features.

34.     In or around February 2022, **VAPPIE** and **CANTRELL** began using WhatsApp as their primary means of exchanging messages.

35.     Between in or around February 2022 and in or around October 2022, **VAPPIE** and **CANTRELL** exchanged over 15,000 messages via WhatsApp.

7

### *Cantrell's Travel*

36.    Approximately five months after **VAPPIE** joined EPU and started providing security protection for **CANTRELL**, **CANTRELL** began arranging for a member of EPU to accompany her on out-of-state trips that required domestic or international air travel.

37.    In or around October 2021, **VAPPIE** accompanied **CANTRELL** to Scotland. **VAPPIE** would later reminisce in a WhatsApp message to **CANTRELL** that the Scotland trip was "where it all started."

38.    In an interview with a local television station recorded on or about September 13, 2022, **CANTRELL** justified having EPU team members accompany her on trips outside the State of Louisiana as being "due to COVID" and "absolutely tied to my health and my well-being." In a separate statement, **CANTRELL** explained that her travel accommodations were "a matter of safety, not of luxury," and that "[a]s all women know, our health and safety are often disregarded, and we are left to navigate alone."

39.    Notwithstanding her justification for needing EPU members to accompany her, **CANTRELL** continued to travel outside the State of Louisiana without EPU.  For example, in or around June 2022, **CANTRELL** traveled to an event in New York, New York, without EPU because **VAPPIE** was "supposed to" go but could not due to injury.

40.    Similarly, on or about September 13, 2022, **CANTRELL** canceled a work trip to Miami, Florida, where she was scheduled to attend the Fall Leadership Meeting of the United States Conference of Mayors.  Instead, at approximately the same time that she canceled the Miami trip, **CANTRELL** booked a personal trip in which she traveled alone from New Orleans to Martha's Vineyard, a Massachusetts island, via commercial airplane, commercial bus, and public

ferry to spend time with **VAPPIE** while he attended a conference paid for by the City of New Orleans related to his position on the HANO Board of Commissioners.

### *Vappie's Official Travel with Cantrell*

41.    Between in or around September 2021 and in or around March 2024, while purporting to serve on-duty as a member of EPU, **VAPPIE** accompanied **CANTRELL** on at least fourteen (14) trips outside the State of Louisiana, including to domestic destinations such as Los Angeles, California; Orlando, Florida; San Francisco, California; and Washington, D.C.; and international destinations such as Scotland and the United Arab Emirates.

42.    The City of New Orleans incurred more than $70,000 in costs related to **VAPPIE's** purported work-related trips outside the State of Louisiana with **CANTRELL**, including travel, lodging, meals, incidentals, and salary.

43.    For example, on or about April 6, 2022, **VAPPIE** and **CANTRELL** traveled from New Orleans to San Francisco for the stated purpose of **CANTRELL** attending an environmental law conference that began on April 6, 2022, and ended on April 8, 2022.

44.    As a result of the April 2022 trip to San Francisco, the City of New Orleans incurred expenses for **VAPPIE** and **CANTRELL** of over $9,000, including paying **VAPPIE** approximately $1,639.68 in salary and overtime.

45.    On or about August 21, 2022, **VAPPIE** and **CANTRELL** traveled from New Orleans to Washington, D.C., for the stated purpose of **CANTRELL** meeting for one hour with a representative of the United States Department of Justice.

46.    As a result of the August 2022 trip to Washington, D.C., the City of New Orleans incurred expenses for **VAPPIE** and **CANTRELL** of over $3,000, including paying **VAPPIE** approximately $1,118.66 in salary and overtime.

47.    On or about September 28, 2022, **VAPPIE** and **CANTRELL** traveled from New Orleans to Atlanta, Georgia, for the stated purpose of **CANTRELL** attending a one-day conference.

48.    On or about September 29, 2022, **VAPPIE** and **CANTRELL** traveled from Atlanta to Los Angeles for the stated purpose of **CANTRELL** attending a "Global Green Community – Lower 9th Ward – Sponsor" launch event.  **CANTRELL** paid approximately $762.18 to upgrade **VAPPIE's** seat to first class on the return flight to New Orleans on or about September 30, 2022, using her personal American Express credit card bearing number x1004.

49.    As a result of the September 2022 trip to Atlanta and Los Angeles, the City of New Orleans incurred expenses for **VAPPIE** and **CANTRELL** of over $5,000, including paying **VAPPIE** approximately $1,402.78 in salary and overtime.

### ***The Pontalba Apartment***

50.    The City of New Orleans owned an apartment, Unit 530B, in the Pontalba Building in the French Quarter of New Orleans (the Pontalba Apartment).

51.    Until in or around March 2024, the Mayor had access to the Pontalba Apartment.

52.    Not later than about mid-2022, EPU members treated the Pontalba Apartment in a manner similar to **CANTRELL's** personal residence, including not providing protection for **CANTRELL** while **CANTRELL** was inside the Pontalba Apartment.

53.    During shifts **VAPPIE** claimed to be on duty for EPU, he frequently spent time inside the Pontalba Apartment both with **CANTRELL** and alone.

### *Public Scrutiny, Discipline, Reassignment, and Retaliation*

54.     On or about November 9, 2022, local New Orleans media outlets first published and broadcast reports regarding **VAPPIE** and his frequent and lengthy presence inside the Pontalba Apartment alone with **CANTRELL**.

55.     **VAPPIE** was removed from EPU and reassigned to another position with NOPD from on or about November 9, 2022, until on or about June 22, 2023.

56.     On or about November 14, 2022, **VAPPIE** conducted numerous online searches for attorneys who specialize in the practice of criminal defense in the greater New Orleans area, including using the names of several attorneys and "female defense attorney near me."

57.     On multiple occasions, including on or about January 18, 2023, **CANTRELL** made public statements in which she denied having a romantic relationship or a physical relationship with **VAPPIE**.

58.     On or about June 15, 2023, the Interim Superintendent of NOPD formally sustained the findings of an internal investigation that concluded **VAPPIE** committed misconduct as a member of EPU.  Shortly before doing so, the Interim Superintendent notified **CANTRELL** of the Interim Superintendent's intent to sustain the proposed findings.

59.     In or around late June 2023, **CANTRELL** directed the Interim Superintendent to reassign **VAPPIE** back to EPU.  Acting at **CANTRELL's** direction, on or about June 22, 2023, the Interim Superintendent did so.

60.     On or about September 11, 2023, **CANTRELL** informed the Interim Superintendent during an in-person meeting that the Interim Superintendent would not become the permanent Superintendent of NOPD.  **VAPPIE** attended the meeting.

61.     On or about September 22, 2023, the Interim Superintendent's tenure ended.

11

62.    Beginning on or about April 15, 2024, local New Orleans media outlets published and broadcast reports about **VAPPIE** and **CANTRELL** dining and consuming alcohol together during times **VAPPIE** claimed to be on duty for EPU.  The reports included photographs of **VAPPIE** and **CANTRELL** engaging in personal activities in public that were taken by a New Orleans resident.

63.    On or about April 22, 2024, **VAPPIE** was again removed from EPU and reassigned to another position with NOPD.

64.    On or about May 9, 2024, **CANTRELL** filed a police report that included non-public information and characterized the behavior of the New Orleans resident who took pictures of **VAPPIE** and **CANTRELL** together in public as "menacing" to the point **CANTRELL** was concerned for her safety.

65.    On or about May 10, 2024, **CANTRELL** filed a "Petition for Protection from Stalking or Sexual Assault" concerning the New Orleans resident who took pictures of **CANTRELL** and **VAPPIE**, claiming that the resident had harassed **CANTRELL** and was risking **CANTRELL's** safety.

66.    On or about June 29, 2024, **VAPPIE** resigned from NOPD.

### *Federal Grand Jury Investigation*

67.    On or about July 14, 2023, special agents with the FBI interviewed **VAPPIE** at his residence in New Orleans, and **VAPPIE** made materially false statements to them. FBI agents also served **VAPPIE** with a subpoena issued by a federal grand jury sitting in the Eastern District of Louisiana (the "July 14 subpoena"). The July 14 subpoena required the production of, among other things, correspondence with **CANTRELL**, gifts **VAPPIE** gave to **CANTRELL**, and pictures of gifts **VAPPIE** gave to **CANTRELL**.

12

68.     On or about July 18, 2023, a federal grand jury sitting in the Eastern District of Louisiana issued a subpoena (the "July 18 subpoena") to **CANTRELL** requiring the production of, among other things, communications (including text and electronic messages) between **CANTRELL** and **VAPPIE** and documents concerning gifts that **VAPPIE** gave **CANTRELL**. In response, **CANTRELL** produced documents and a sworn affidavit containing false information.

69.     On or about May 31, 2024, a federal grand jury issued a subpoena (the "May 31 subpoena") to **CANTRELL** requiring her appearance before the grand jury.

70.     On or about June 28, 2024, **CANTRELL** appeared before a federal grand jury sitting in the Eastern District of Louisiana, was placed under oath, and she testified falsely.

**B.     THE CONSPIRACY:**

Beginning at a time unknown, but not later than in or around October 2021, and continuing until on or about June 29, 2024, in the Eastern District of Louisiana and elsewhere, the defendants, **JEFFREY PAUL VAPPIE, II** and **LATOYA CANTRELL**, did knowingly and willfully combine, conspire, and agree to devise and intend to devise a scheme and artifice to defraud and to obtain money and property from the City of New Orleans and NOPD by means of materially false and fraudulent pretenses, representations, and promises, by use of interstate wire transmissions, in violation of Title 18, United States Code, Section 1343.

**C.     PURPOSE OF THE CONSPIRACY:**

The purpose of the conspiracy included the following: (a) to convert to the personal use of the conspirators money and property belonging to the City of New Orleans and NOPD; (b) to enrich the conspirators by obtaining and retaining money and property to which the conspirators were not entitled; and (c) to conceal the nature and purposes of the scheme and artifice to defraud.

D.    **MANNER AND MEANS OF THE CONSPIRACY:**

The manner and means by which **JEFFREY PAUL VAPPIE, II** and **LATOYA CANTRELL** sought to accomplish the object and purpose of the conspiracy included, among other things, the following:

71.    Beginning not later than in or around October 2021, **VAPPIE** and **CANTRELL** carried on a personal and intimate relationship, which **VAPPIE** and **CANTRELL** attempted to disguise by making **VAPPIE's** interactions with **CANTRELL** appear to relate to **VAPPIE's** duties and responsibilities as a member of EPU assigned to provide personal protection for **CANTRELL**.

72.    **VAPPIE** submitted and caused others to submit on his behalf timecards to NOPD for periods he falsely claimed to have worked on duty, when, in fact, **VAPPIE** was engaged in personal activities unrelated to his work duties.

73.    In or around February 2022, **VAPPIE** and **CANTRELL** began using WhatsApp as their primary means of exchanging messages.  **CANTRELL** told a trusted staff member that she was "moving [**VAPPIE**] to WhatsApp all together," had "[d]eleted our history," and "[p]ut him back in my phone as vappie but business only[.]"

74.    **VAPPIE** and **CANTRELL** exchanged over 15,000 personal messages, pictures, and voice messages via WhatsApp to avoid detection and continue their relationship.

75.    **VAPPIE** and **CANTRELL** deleted messages they exchanged.

76.    **VAPPIE** and **CANTRELL** discussed which City of New Orleans employees could and could not be trusted with the truth about their personal and intimate relationship.

77.    When asked by fellow EPU members, **VAPPIE** denied his involvement in an intimate relationship with **CANTRELL**.

14

78.    **VAPPIE** participated in HANO meetings during his on-duty shifts with EPU.

79.    **VAPPIE** and **CANTRELL** ate meals and consumed alcohol together at restaurants during periods **VAPPIE** claimed to be working on duty as a member of EPU.

80.    **VAPPIE** and **CANTRELL** treated the Pontalba Apartment as their personal shared residence, with **CANTRELL** often referring to it as "our apartment" when messaging **VAPPIE**. **VAPPIE** and **CANTRELL** frequently coordinated spending time together inside the apartment during periods **VAPPIE** claimed to be on duty for EPU.  **CANTRELL** occasionally canceled scheduled work events to facilitate personal and intimate interactions with **VAPPIE** in the Pontalba Apartment.

81.    **VAPPIE** and **CANTRELL** used their public positions to coordinate work trips outside the State of Louisiana, which were paid for by the City of New Orleans and NOPD, for the purpose of manufacturing opportunities for **VAPPIE** and **CANTRELL** to engage in personal and intimate activities at taxpayers' expense.

82.    **VAPPIE** submitted, and **CANTRELL** signed and authorized, **VAPPIE's** travel expense forms after out-of-state trips, despite knowing they falsely reflected that **VAPPIE** had engaged exclusively in official business activities.

83.    **CANTRELL** lied to members of the news media about the reason she had EPU members accompany her on out-of-state trips.

84.    **VAPPIE** attempted to persuade the Interim Superintendent to exonerate him by telling the Interim Superintendent that it was the Interim Superintendent's opportunity to "make it right" before the Interim Superintendent decided whether to censure **VAPPIE**.

85.    **CANTRELL** convened a meeting, which **VAPPIE** attended, and told the Interim Superintendent that **CANTRELL** would not nominate the Interim Superintendent to serve as the

permanent Superintendent of NOPD. After the meeting, **VAPPIE** invited the Interim Superintendent to a daiquiri shop to discuss the Interim Superintendent's recent demotion and mitigate the Interim Superintendent's disappointment.

86.    **CANTRELL** abused her public position to seek non-public information in support of, and to obtain, a temporary restraining order against a New Orleans resident who photographed and shared images of **CANTRELL** and **VAPPIE** dining and consuming alcohol together outside, while **VAPPIE** claimed to be working on duty as a member of EPU, in order to suppress and discourage inquiry into **CANTRELL's** public behavior with **VAPPIE**.

87.    **VAPPIE** lied to federal agents who interviewed him about, among other things, the true nature of his relationship with **CANTRELL**.

88.    **CANTRELL** concealed and withheld documents responsive to a federal grand jury subpoena that would reveal the true nature of her relationship with **VAPPIE**.

89.    **CANTRELL** provided an affidavit containing false statements to the grand jury about whether she withheld responsive documents from production and the reasons for her failure to produce materials in response to the July 18 subpoena.

90.    **CANTRELL** lied to the grand jury about the completeness and accuracy of the records she produced in response to the July 18 subpoena.

E.    **OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY:**

In furtherance of the conspiracy and to achieve the objects thereof, the defendants, **JEFFREY PAUL VAPPIE, II** and **LATOYA CANTRELL**, committed and caused to be committed the following overt acts, among others, in the Eastern District of Louisiana and elsewhere:

16

91.     On or about February 25, 2022, **CANTRELL** canceled official meetings and events throughout the day to spend time with **VAPPIE** in the Pontalba Apartment while **VAPPIE** claimed to be on duty as a member of EPU.

92.     On or about February 27, 2022, **VAPPIE** caused an NOPD sergeant to report that **VAPPIE** worked on duty as a member of EPU from 8:00 a.m. on February 25, 2022, until 12:00 a.m. on February 26, 2022, despite spending hours inside the Pontalba Apartment with **CANTRELL** during that period.

93.     On or about March 3, 2022, **VAPPIE** conducted an online search for "nashville mayor affair."

94.     On or about March 7, 2022, **CANTRELL** and **VAPPIE** exchanged the following messages via WhatsApp:

| | |
|---|---|
| **CANTRELL:** | SF is April 6-8. It officially ends at 4pm on the 8th. Do we return on the 8th and stay at apartment or return on the 9th? |
| **VAPPIE:** | Absolutely! |
| **CANTRELL:** | Absolutely on what?? |
| **VAPPIE:** | On the going to the apartment after the trip. |
| **VAPPIE:** | Oh, I'm sorry, I got it now. |
| **VAPPIE:** | We stay and do the Nappa Valley like you said. |
| **CANTRELL:** | Perfect *thumbs up emoji* |
| **VAPPIE:** | *thumbs up emoji* |

95.     On or about March 22, 2022, **CANTRELL** appointed **VAPPIE** to the HANO Board of Commissioners.

96.     After an EPU member sent a text message to the rest of EPU on or about March 31, 2022, stating that anyone on EPU having an affair with **CANTRELL** should stop because of the detrimental consequences it could have on **CANTRELL** and the EPU team, **CANTRELL** and **VAPPIE** separately confronted the EPU member about the text message, and **VAPPIE** denied to the EPU member that he and **CANTRELL** were engaged in an intimate relationship.

97.     On or about April 4, 2022, **CANTRELL** told an associate, "Please don't accuse me," in response to a text message telling **CANTRELL**, "It is A FELONY to have your lover be paid to work and have his travel paid for by the city. That Nashville mayor had to pay back like 50k AND serve 3 yrs probation. She is done! Please don't let this be your path, LaToya!!!"

98.     On or about April 5, 2022, in response to an associate's text message that "[s]pending public funds and using public resources for your personal relationship" was illegal, **CANTRELL** falsely stated that her relationship with **VAPPIE** was "not about a personal relationship," was "a work relationship," and challenged her associate to "prove to me that I am having a relationship[.]"

99.     On or about April 9, 2022, **VAPPIE, CANTRELL,** and one of **CANTRELL's** trusted staff members visited several California wineries and appeared in a picture that the trusted staff member posted on a social media platform:



Shortly thereafter, an associate of **CANTRELL's** contacted **CANTRELL's** trusted staff member, expressed concern that **VAPPIE** was in the picture, and asked that it be removed. **CANTRELL** then instructed the associate to "NOT contact MY staff."

100.    On or about April 10, 2022, **VAPPIE** reported the time he claimed to have worked between March 27, 2022, and April 9, 2022. Specifically, he reported that he worked on duty as a member of EPU from 8:00 a.m. to 8:00 p.m. on March 29, 2022, despite spending hours inside the Pontalba Apartment with **CANTRELL** engaging in personal activities and attending a HANO Board of Commissioners meeting during that period. **VAPPIE** also reported that he worked the following hours as a member of EPU during the San Francisco trip:

> April 6, 2022: 15 hours (9:00 a.m. – 12:00 a.m.)
>
> April 7, 2022: 15 hours (9:00 a.m. – 12:00 a.m.)
>
> April 8, 2022: 15 hours (9:00 a.m. – 12:00 a.m.)
>
> April 9, 2022: 15 hours (9:00 a.m. – 12:00 a.m.)

101.    On or about April 13, 2022, **VAPPIE** submitted a travel expense form, which **CANTRELL** later approved, for $2,399.80 in expenses related to the trip to San Francisco.

102.    On or about August 5, 2022, **CANTRELL** and **VAPPIE** manipulated their schedules to allow them additional time to spend together in the Pontalba Apartment while **VAPPIE** claimed to be on duty, including by having **VAPPIE** text his EPU partner on or about August 4, 2022, "Hey [Name of EPU partner], message from the boss, meet at City Hall for 10a instead of 6:30 pick up."

103.    On or about August 17, 2022, **CANTRELL** and **VAPPIE** exchanged the following messages via WhatsApp:

| | |
|---|---|
| **CANTRELL:** | So I will have to go to DC on Monday |
| **VAPPIE:** | I know |
| **CANTRELL:** | I want to leave on Sunday |
| **CANTRELL:** | Will you be going? |
| **VAPPIE:** | Absolutely, if it's possible |
| **VAPPIE:** | [Name of subordinate in Mayor's Office] didn't or rather hasn't said anything |
| **CANTRELL:** | Ok |
| **CANTRELL:** | I will make that happen if you say it's ok |
| **VAPPIE:** | It's definitely ok |
| **CANTRELL:** | Ok |
| **CANTRELL:** | *smiley face emoji* |
| **CANTRELL:** | I want to leave Sunday and back on Tuesday |
| **VAPPIE:** | ok |
| **CANTRELL:** | [Name of subordinate in Mayor's Office] has info |

| VAPPIE: | Good, got it. We need this |
|---|---|
| CANTRELL: | Boy do we need this |

104.    On or about August 23, 2022, **VAPPIE** sent **CANTRELL** a message via WhatsApp in which **VAPPIE**, among other things, described the Washington, D.C. trip as "another great trip, and also another leg on our journey" and told **CANTRELL** that he loved her and their physical relationship.

105.    On or about August 23, 2022, **VAPPIE** and **CANTRELL** arranged for **VAPPIE** to replace another EPU member on an upcoming trip **CANTRELL** was scheduled to take to Buenos Aires, Argentina, which **VAPPIE** later described as "a nice one."

106.    On or about August 24, 2022, **VAPPIE** submitted a travel expense form, which **CANTRELL** later approved, for $1,315.90 in expenses related to the August trip to Washington, D.C.

107.    On or about September 15, 2022, while **VAPPIE** was in Martha's Vineyard for a HANO trip, **CANTRELL** and **VAPPIE** exchanged the following messages via WhatsApp:

| VAPPIE: | Hey baby I'm going to go to luch [sic] with the guys, and come be with you at the end of today's conference. |
|---|---|
| VAPPIE: | I'm not going on the bus tour. |
| CANTRELL: | Ok |
| CANTRELL: | Good |
| CANTRELL: | So that is about 3:30 you will be done? |
| VAPPIE: | Meaning we get out earlier |
| CANTRELL: | Let me know about where for lunch to make sure I'm out of sight[.] |

108.    On or about September 23, 2022, **CANTRELL** and **VAPPIE** discussed a public records request seeking information about **CANTRELL's** schedule and whether a particular local investigative reporter (Member of News Media 1) was "on to us."

109.    On or about September 25, 2022, **CANTRELL** sent **VAPPIE** a message via WhatsApp that stated, "The times when we are truly alone (traveling) is what spoils me the most."

110.    On or about September 29, 2022, during a period **VAPPIE** purported to be on duty in the Los Angeles area providing protection for **CANTRELL** as a member of EPU, **VAPPIE** purchased multiple alcoholic beverages and charged the expense to **CANTRELL's** room:



111.    On or about October 3, 2022, **CANTRELL** and **VAPPIE** discussed via WhatsApp the need to "be careful" and to "be straight and together[.]"

112.    On or about October 4, 2022, **CANTRELL** and **VAPPIE** discussed via WhatsApp having someone perform a "sweep" of the Pontalba Apartment to search for recording devices.

113.    On or about October 9, 2022, **VAPPIE** reported that he worked the following hours as a member of EPU during a trip to Atlanta and then to Los Angeles, between on or about September 28, 2022, and September 30, 2022, for the purpose of **CANTRELL** attending conferences:

September 28, 2022: 18 hours (4:00 a.m. – 10:00 p.m.)

September 29, 2022: 16 hours (6:00 a.m. – 10:00 p.m.)

September 30, 2022: 16 hours (6:00 a.m. – 10:00 p.m.)

114.    On or about October 24, 2022, **VAPPIE** submitted a travel expense form, which **CANTRELL** later approved, for $2,621.82 in expenses related to the September trip to Atlanta and Los Angeles.

115.    On or about November 12, 2022, after public news reports speculated about the existence of an intimate relationship between **VAPPIE** and **CANTRELL**, **VAPPIE** conducted online searches regarding WhatsApp and its level of security.

116.    On or about December 26, 2022, **CANTRELL** activated the "disappearing messages" feature for her WhatsApp communication thread with **VAPPIE** on her personal cellular device, which caused all new WhatsApp messages between **CANTRELL** and **VAPPIE** to disappear after approximately twenty-four (24) hours.

117.    Between in or around October 2022 and in or around January 2023, **CANTRELL** manually deleted thousands of WhatsApp messages she exchanged with **VAPPIE**.

118.    On or about March 19, 2023, after a local news media outlet broadcast additional reports about **VAPPIE's** work on EPU and relationship with **CANTRELL**, **VAPPIE** conducted multiple online searches concerning a member of the news media who reported about **VAPPIE**, including "Where does [Member of News Media 1] live[.]"

23

119.    In or around June 2023, **CANTRELL** directed the Interim Superintendent to reassign **VAPPIE** to EPU, and the Interim Superintendent complied.

120.    On or about July 14, 2023, **VAPPIE** spoke with special agents with the FBI at his residence in New Orleans for over one hour, during which he gave numerous false statements regarding, among other things, the nature of his relationship with **CANTRELL**.

121.    On or about July 15, 2023, the day after speaking with special agents with the FBI, **VAPPIE** visited the "About disappearing messages" webpage within the WhatsApp website's "Help Center."

122.    On or about October 25, 2023, in response to the July 18 subpoena, **CANTRELL** produced a selection of records, which did not include numerous responsive records still in her possession, and an affidavit signed under oath that contained multiple materially false representations.

123.    On or about May 9, 2024, **CANTRELL** abused her position to obtain non-public information, and then file a police report, about a New Orleans resident who took and disseminated photographs of **CANTRELL** and **VAPPIE** together in public.

124.    On or about May 10, 2024, **CANTRELL** used the non-public information she obtained to seek and obtain a restraining order against the New Orleans resident.

125.    On or about June 28, 2024, **CANTRELL** appeared under oath before a federal grand jury sitting in the Eastern District of Louisiana. She affirmed that she had reviewed and signed the affidavit. **CANTRELL** also testified falsely that, to the best of her knowledge, she had produced all documents responsive to the subpoena that were in her possession and that none had been withheld from production.

126.    Between at least in or around March 2022 and in or around April 2024, **VAPPIE** and **CANTRELL** caused interstate wire communications in the form of payments from the City of New Orleans and NOPD to **VAPPIE** and financial accounts under his control.

All in violation of Title 18, United States Code, Section 371.

### COUNTS 2 – 13
(18 U.S.C. § 1343 – Wire Fraud)

**A.    AT ALL TIMES MATERIAL HEREIN:**

127.    The allegations of Count 1 are hereby realleged and incorporated herein in their entirety by reference.

**B.    THE SCHEME AND ARTIFICE TO DEFRAUD:**

Beginning at a time unknown, but not later than in or around October 2021, and continuing at least through on or about June 29, 2024, in the Eastern District of Louisiana and elsewhere, the defendants, **JEFFREY PAUL VAPPIE, II** and **LATOYA CANTRELL**, did knowingly devise and intend to devise a scheme and artifice to defraud and obtain money and property by means of false and fraudulent pretenses, representations, and promises, namely, submitting, and causing to be submitted, false timecards to NOPD and false travel expense forms to the City of New Orleans for **VAPPIE,** receiving benefits and money to which they were not entitled as a result of those submissions, and abusing their positions as public officials to conceal and perpetuate their scheme.

**C.    THE OFFENSE:**

On or about the dates listed below, in the Eastern District of Louisiana and elsewhere, **JEFFREY PAUL VAPPIE, II** and **LATOYA CANTRELL**, for the purpose of executing, and attempting to execute, the aforesaid scheme and artifice to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations and promises, did knowingly

transmit, and cause to be transmitted in interstate commerce, certain writings, signs, signals and

sounds by means of wire communications, described below for each count:

| Count | Defendant(s) | Payment Date | Description |
|---|---|---|---|
| 2 | **VAPPIE** | March 4, 2022 | **VAPPIE** received payment from NOPD via electronic direct deposit into Chase Account No. x1877 that included approximately $443.44 for claiming to be on duty on or about February 25, 2022, from about 8:00 a.m. to 12:00 a.m. |
| 3 | **VAPPIE CANTRELL** | April 15, 2022 | **VAPPIE** received payment from NOPD via electronic direct deposit into Chase Account No. x1877 that included:<br>• approximately $335.00 for claiming to be on duty on or about March 29, 2022, from about 8:00 a.m. to 8:00 p.m., and<br>• approximately $409.92 for claiming to be on duty on or about April 9, 2022, from about 9:00 a.m. to 12:00 a.m. |
| 4 | **VAPPIE CANTRELL** | May 17, 2022 | **VAPPIE** cashed a $378.43 check from the City of New Orleans (invoice number 26524, check number 112643) for per diem and incidentals based on the submission of a travel expense form by **VAPPIE** and approved by **CANTRELL** for **VAPPIE's** April 6, 2022, to April 9, 2022, trip to San Francisco. |
| 5 | **VAPPIE** | August 19, 2022 | **VAPPIE** received payment from NOPD via electronic direct deposit into Chase Account No. x1877 that included:<br>• approximately $335.00 for claiming to be on duty on or about August 2, 2022, from about 7:00 a.m. to 7:00 p.m.,<br>• approximately $237.93 for claiming to be on duty on or about August 3, 2022, from about 6:25 a.m. to 3:00 p.m.,<br>• approximately $335.00 for claiming to be on duty on or about August 5, 2022, from about 7:00 a.m. to 7:00 p.m.,<br>• approximately $420.24 for claiming to be on duty on or about August 6, 2022, from about 7:00 a.m. to 10:00 p.m.,<br>• approximately $335.00 for claiming to be on duty on or about August 8, 2022, from about 8:00 a.m. to 8:00 p.m., |

| Count | Defendant(s) | Payment Date | Description |
|---|---|---|---|
| | | | • approximately $335.00 for claiming to be on duty on or about August 9, 2022, from about 8:00 a.m. to 8:00 p.m., <br>• approximately $335.00 for claiming to be on duty on or about August 11, 2022, from about 9:00 a.m. to 9:00 p.m., and <br>• approximately $335.00 for claiming to be on duty on or about August 12, 2022, from about 8:00 a.m. to 8:00 p.m. |
| 6 | **VAPPIE CANTRELL** | September 2, 2022 | **VAPPIE** received payment from NOPD via electronic direct deposit into Chase Account No. x1877 that included: <br>• approximately $335.00 for claiming to be on duty on or about August 16, 2022, from about 9:00 a.m. to 9:00 p.m., <br>• approximately $335.00 for claiming to be on duty on or about August 18, 2022, from about 9:00 a.m. to 9:00 p.m., <br>• approximately $335.00 for claiming to be on duty on or about August 19, 2022, from about 8:00 a.m. to 8:00 p.m., <br>• approximately $418.86 for claiming to be on duty on or about August 21, 2022, from about 7:00 a.m. to 10:00 p.m., <br>• approximately $418.86 for claiming to be on duty on or about August 22, 2022, from about 7:00 a.m. to 10:00 p.m., <br>• approximately $391.83 for claiming to be on duty on or about August 23, 2022, from about 7:00 a.m. to 9:00 p.m., and <br>• approximately $335.00 for claiming to be on duty on or about August 25, 2022, from about 9:00 a.m. to 9:00 p.m. |

| Count | Defendant(s) | Payment Date | Description |
|---|---|---|---|
| 7 | **VAPPIE** | September 16, 2022 | **VAPPIE** received payment from NOPD via electronic direct deposit into Chase Account No. x1877 that included:<br>• approximately $362.47 for claiming to be on duty on or about September 2, 2022, from about 8:00 a.m. to 9:00 p.m.,<br>• approximately $335.00 for claiming to be on duty on or about September 3, 2022, from about 8:00 a.m. to 8:00 p.m.,<br>• approximately $335.00 for claiming to be on duty on or about September 4, 2022, from about 7:00 a.m. to 7:00 p.m.,<br>• approximately $335.00 for claiming to be on duty on or about September 7, 2022, from about 8:00 a.m. to 8:00 p.m.,<br>• approximately $391.83 for claiming to be on duty on or about September 8, 2022, from about 8:00 a.m. to 10:00 p.m., and<br>• approximately $335.00 for claiming to be on duty on or about September 9, 2022, from about 8:00 a.m. to 8:00 p.m. |
| 8 | **VAPPIE CANTRELL** | October 4, 2022 | **VAPPIE** cashed a $217.81 check from the City of New Orleans (invoice number 29345, check number 118901) for per diem and incidentals based on the submission of a travel expense form by **VAPPIE** and approved by **CANTRELL** for **VAPPIE's** August 21, 2022, to August 23, 2022, trip to Washington, D.C. |
| 9 | **VAPPIE CANTRELL** | October 14, 2022 | **VAPPIE** received payment from NOPD via electronic direct deposit into Chase Account No. x1877 that included:<br>• approximately $335.00 for claiming to be on duty on or about September 26, 2022, from about 8:00 a.m. to 8:00 p.m.,<br>• approximately $505.48 for claiming to be on duty on or about September 28, 2022, from about 4:00 a.m. to 10:00 p.m., |

| Count | Defendant(s) | Payment Date | Description |
|---|---|---|---|
|  |  |  | • approximately $448.65 for claiming to be on duty on or about September 29, 2022, from about 6:00 a.m. to 10:00 p.m., and<br>• approximately $448.65 for claiming to be on duty on or about September 30, 2022, from about 6:00 a.m. to 10:00 p.m. |
| 10 | **VAPPIE** | October 28, 2022 | **VAPPIE** received payment from NOPD via electronic direct deposit into Chase Account No. x1877 that included approximately $335.00 for claiming to be on duty on or about October 18, 2022, from about 8:00 a.m. to 8:00 p.m. |
| 11 | **VAPPIE CANTRELL** | November 23, 2022 | **VAPPIE** cashed a $487.57 check from the City of New Orleans (invoice number 30734, check number 202407) for per diem and incidentals based on the submission of a travel expense form by **VAPPIE** and approved by **CANTRELL** for **VAPPIE's** September 28, 2022, to September 30, 2022, trip to Atlanta and Los Angeles. |
| 12 | **VAPPIE** | April 12, 2024 | **VAPPIE** received payment from NOPD via electronic direct deposit into Chase Account No. x8514 that included approximately $370.01 for claiming to be on duty on or about March 28, 2024, from about 8:00 a.m. to 8:00 p.m. |
| 13 | **VAPPIE** | April 26, 2024 | **VAPPIE** received payment from NOPD via electronic direct deposit into Chase Account No. x8514 that included approximately $370.01 for claiming to be on duty on or about April 7, 2024, from about 8:00 a.m. to 8:00 p.m. |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## **COUNT 14**
(18 U.S.C. § 1512(k) – Conspiracy to Obstruct Justice)

**A.    AT ALL TIMES MATERIAL HEREIN:**

128.    The allegations of Count 1 are hereby realleged and incorporated herein in their entirety by reference.

**B.    THE CONSPIRACY:**

Beginning at a time unknown, but not later than in or around October 2021, and continuing until the date of the superseding indictment, in the Eastern District of Louisiana and elsewhere, the defendants, **JEFFREY PAUL VAPPIE, II** and **LATOYA CANTRELL**, did knowingly and willfully combine, conspire, and agree:

129.    To corruptly alter, destroy, mutilate, and conceal a record, document, and other object, with the intent to impair the object's integrity and availability for use in an official proceeding, in violation of Title 18, United States Code, Section 1512(c)(1); and

130.    To corruptly obstruct, influence, and impede an official proceeding, and attempt to corruptly obstruct, influence, and impede an official proceeding, in violation of Title 18, United States Code, Section 1512(c)(2).

**C.    PURPOSE OF THE CONSPIRACY:**

The purpose of the conspiracy was for **JEFFREY PAUL VAPPIE, II** and **LATOYA CANTRELL** to prevent a federal grand jury from uncovering their scheme to defraud the City of New Orleans and NOPD, including by hiding and concealing documents that would reveal their scheme.

**D.    MANNER AND MEANS OF THE CONSPIRACY:**

The manner and means by which **JEFFREY PAUL VAPPIE, II** and **LATOYA CANTRELL** sought to accomplish the object and purpose of the conspiracy included, among other things, the following:

131.    Using WhatsApp to communicate with one another.

132.    Activating features on WhatsApp to cause new messages between **CANTRELL** and **VAPPIE** to disappear.

133.    Deleting messages between **CANTRELL** and **VAPPIE**.

134.    Providing false and misleading statements and information to EPU personnel, **CANTRELL's** advisors, members of the news media, and the public, about their relationship.

135.    Abusing the power of their positions, including by discouraging inquiries into the status of their relationship by, among other things, intimidating advisors and subordinates.

136.    Intimidating a resident of the City of New Orleans for the purpose of suppressing and discouraging inquiry into **CANTRELL's** public behavior with **VAPPIE**.

137.    Lying to federal law enforcement authorities.

138.    Signing and submitting, under oath and penalty of perjury, an affidavit containing false statements in response to a subpoena issued by a federal grand jury.

139.    Creating false evidence for a federal grand jury, including screenshots from **CANTRELL's** personal cellular telephone that **CANTRELL** falsely claimed supported misrepresentations in her affidavit.

140.    Withholding from production material responsive to a subpoena issued by a federal grand jury.

141.    Making false statements to a federal grand jury while under oath.

All in violation of Title 18, United States Code, Section 1512(k).

**COUNT 15**
(18 U.S.C. § 1001(a)(2) – False Statements)

A.    **AT ALL TIMES MATERIAL HEREIN:**

142.    The allegations of Counts 1 and 14 are hereby realleged and incorporated herein in their entirety by reference.

31

143.    The Federal Bureau of Investigation was an agency within the United States Department of Justice, which was a Department within the Executive Branch of the Government of the United States.

144.    On or about March 30, 2022, **VAPPIE** conducted an online search for "[W]hat was Whitney Houston's character name in The Bodyguard[?]"[1]

145.    On or about June 11, 2022, **CANTRELL** sent **VAPPIE** the following images and messages via WhatsApp:




---

[1] "The Bodyguard" was a 1992 romantic drama starring Kevin Costner and Whitney Houston in which a male bodyguard (played by Costner) was hired to protect a female celebrity (played by Houston). After initial attempts to remain professional, the bodyguard and the celebrity engaged in a romantic relationship, during which the bodyguard attempted to break off the affair because he realized it compromised his ability to protect the celebrity.

146.    On or about June 21, 2022, **VAPPIE** sent **CANTRELL** the following message and image taken in the Pontalba Apartment via WhatsApp:



147.    **VAPPIE** and **CANTRELL** exchanged numerous text messages, voice messages, and images via WhatsApp between at least February 2022 and January 2023, including on March

3, 2022, March 8, 2022, March 14, 2022, March 17, 2022, May 9, 2022, May 11, 2022, May 18, 2022, June 25, 2022, September 23, 2022, September 25, 2022, September 29, 2022, and October 3, 2022, in which **VAPPIE** and **CANTRELL** each used terms of endearment and expressed their love, attraction, and affection for each other. In those messages, **VAPPIE** and **CANTRELL** repeatedly said that they loved each other and discussed their physical and intimate relationship.

**B.    THE OFFENSE:**

On or about July 14, 2023, in the Eastern District of Louisiana, the defendant, **JEFFREY PAUL VAPPIE, II**, did willfully and knowingly make materially false, fictitious, and fraudulent statements and representations, in a matter within the jurisdiction of a department or agency of the United States, by stating to an agent of the Federal Bureau of Investigation, an agency of the United States government, that **VAPPIE** did not have, and never had, a physical relationship or a romantic relationship with Cantrell, that **VAPPIE** had never kissed Cantrell, and that **VAPPIE** had never told Cantrell that **VAPPIE** loved Cantrell. These statements and representations were false because, as the defendant, **JEFFREY PAUL VAPPIE, II**, then and there knew, since at least October 2021, **VAPPIE** had been in a romantic relationship, and a physical relationship, with Cantrell, **VAPPIE** had kissed Cantrell, and **VAPPIE** had told Cantrell that **VAPPIE** loved Cantrell, in violation of Title 18, United States Code, Section 1001(a)(2).

## COUNT 16
(18 U.S.C. § 1512(c)(1) – Obstruction of Justice)

**A.    AT ALL TIMES MATERIAL HEREIN:**

148.    The allegations of Counts 1, 14, and 15 are hereby realleged and incorporated herein in their entirety by reference.

149.    The July 18 subpoena issued by the federal grand jury and served on **CANTRELL** required **CANTRELL** to produce, among other things:

    a.   "All documents, records, and/or correspondence concerning any and all travel with Jeffrey Vappie, including, but not limited to, invoices, expense payments and/or reimbursements, credit card/debit card records, receipts, checks, approvals, travel itineraries, tickets, dates of travel, pictures, place(s) of travel, and purpose(s) of travel[.]"

    b.   "All documents, records, and/or correspondence concerning any gift or thing of value, including, but not limited to meals, jewelry, clothing, and political (*i.e.*, campaign) donations provided to you by Jeffrey Vappie.  This request expressly includes any pictures of any such gifts or things of value provided to you by Jeffrey Vappie[.]"

    c.   "All documents, records, and/or correspondence concerning any communications between you and Jeffrey Vappie including, but not limited to text messages (SMS and MMS), electronic messages (including messages sent via instant messaging platforms and social media platforms), emails, notes and pictures[.]"

150.    **CANTRELL's** production of records in response to the July 18 subpoena did not include messages, pictures, or audio files she exchanged with **VAPPIE** via WhatsApp; handwritten communications with **VAPPIE**; or personal communications of any kind exclusively between **CANTRELL** and **VAPPIE**.

**B.    THE OFFENSE:**

On or about October 25, 2023, in the Eastern District of Louisiana, the defendant, **LATOYA CANTRELL**, did corruptly conceal a record, document, and other object, and attempted to do so, with the intent to impair its integrity and availability for use in an official proceeding; that is, **CANTRELL** hid and withheld from production to a federal grand jury electronic files contained on her cellular phone, and in her Apple iCloud account, specifically more than fifty pictures **CANTRELL** had exchanged with Vappie, including screenshots of correspondence and things of value Vappie gave **CANTRELL**.

All in violation of Title 18, United States Code, Sections 1512(c)(1) and 2.

**COUNT 17**
(18 U.S.C. § 1623 – False Declaration Before Grand Jury)

**A.    AT ALL TIMES MATERIAL HEREIN:**

151.    The allegations of Counts 1, 14, 15, and 16 are hereby realleged and incorporated herein in their entirety by reference.

152.    At the time of the July 18 subpoena, **CANTRELL's** production on October 25, 2023, and **CANTRELL's** appearance before the grand jury on June 28, 2024, a federal grand jury was investigating alleged violations of federal criminal laws, including Title 18, United States Code, Section 1343 (wire fraud) and conspiracy to commit that offense.

153.    The following matters, among others, were material to the grand jury's investigation:

a. The true nature of the relationship between **CANTRELL** and **VAPPIE**;

b. When, whether, and to what extent **VAPPIE** was claiming to be on duty for NOPD during periods he was engaged in personal activities unrelated to his work duties;

c. **VAPPIE's** location and conduct during periods he claimed to be on duty for NOPD;

d. Whether and to what extent **CANTRELL** had knowledge regarding **VAPPIE** claiming to be on duty for NOPD, specifically during periods he was engaged in personal activities unrelated to his work duties;

e. Whether and to what extent **CANTRELL** influenced **VAPPIE's** inclusion in **CANTRELL's** out-of-state trips;

f. Whether and to what extent **VAPPIE's** out-of-state travel and conduct while out of state with **CANTRELL** was a pretext for **VAPPIE** to engage in personal activities unrelated to his work duties; and

g. Whether **CANTRELL** and **VAPPIE** were co-conspirators, principals, or accessories in the scheme.

154. In response to the July 18 subpoena, **CANTRELL** produced an affidavit **CANTRELL** signed, under oath and penalty of perjury under the laws of the United States of America, attesting to the following, among other things:

a. "In response to the subpoena served on me as described above, I, LaToya Cantrell, conducted, and/or directed others on my behalf, a complete and thorough search of all areas within my direct and/or constructive possession where records concerning the above-mentioned entities might be found,

       including in any 'cloud' or 'backup' locations in which electronic data may be stored."

b. "The documents that have been produced are all the responsive documents in my possession, custody, and control. To my knowledge, no documents have been withheld."

c. "Other than the documents set forth in Paragraph 5 above, I am unaware of the existence of any additional documents that are responsive to the subpoena."

d. "Additionally and independently, I have confirmed that my personal cellular telephone has a setting that deletes all sent and received messages within 30 days. That feature affects messages sent or received commencing during approximately the year 2021, when I learned of that feature, when I implemented the feature on my personal cellular telephone, to the best of my information and belief. A screen shot of that setting from my personal cellular telephone has been produced as Bates numbers 000004 and 000005."

**B.    THE OFFENSE:**

155.    On or about October 25, 2023, in the Eastern District of Louisiana, the defendant, **LATOYA CANTRELL**, appearing under oath at a proceeding before and ancillary to the grand jury, did knowingly make, in response to the July 18 subpoena and with respect to the material matters alleged in Paragraph 153 of the superseding indictment, the following false material declarations:

a. The documents **CANTRELL** produced were all the responsive documents in her possession, custody, and control, and that, to her knowledge, no documents had been withheld.

    b.   Other than the documents set forth in Paragraph 5 of her sworn affidavit, **CANTRELL** was unaware of the existence of any additional documents responsive to the subpoena.

    c.   **CANTRELL** confirmed that her personal cellular telephone had a setting that deleted all sent and received messages within 30 days, which affected messages sent or received commencing during approximately the year 2021, when she learned of that feature and implemented it on her personal cellular telephone.

    d.   **CANTRELL** produced screenshots from her personal cellular telephone of that setting to support her statement in Paragraph 155(c) of the superseding indictment.

156.    In truth and in fact, when **CANTRELL** made these statements in her sworn affidavit, **CANTRELL** knew that:

    a.   She withheld from production responsive documents in her possession, custody, and control.

    b.   Documents responsive to the subpoena, other than those referenced in Paragraph 5 of her sworn affidavit, existed;

    c.   She did not "implement" a setting that deleted all sent and received messages within 30 days in 2021, and, in fact, **CANTRELL** applied that feature to her WhatsApp messages with Vappie in or around December 2022;

    d.   The setting that deleted all sent and received messages within 30 days did not apply to all messages sent or received before she implemented it; and

e.  The screenshots **CANTRELL** produced reflected settings that were not implemented in 2021.

All in violation of Title 18, United States Code, Section 1623.

## COUNT 18
(18 U.S.C. § 1623 – False Declaration Before Grand Jury)

**A.**    **AT ALL TIMES MATERIAL HEREIN:**

157.    The allegations of Counts 1, 14, 15, 16, and 17 are hereby realleged and incorporated herein in their entirety by reference.

158.    On or about June 28, 2024, **CANTRELL**, while under oath at a proceeding before the grand jury, made the following declarations in response to questions concerning her obligation, pursuant to the July 18 subpoena, to produce materials:

> Q:    And to be clear, you have undertaken an attempt to locate responsive documents, such that you could produce them, they can be produced to the government, correct?

> A:    Actually most were produced by staff members of the City of New Orleans that maintain those types of documents and records.

> Q:    You're aware, however, that to the extent this subpoena covers categories of documents that are maintained on any personal --

> A:    Yes.

> Q:    -- devices or home places that presumably the City of New Orleans does not have access to, you are never the less responsible for complying with the terms of the subpoena, locating those records, and producing them?

> A:    Personal information that was requested was provided.

> Q:    Okay. And as you sit here now, you're not aware of any additional material responsive to this subpoena in your custody, control or possession that you have not produced in response to the subpoena, correct?

> A:    It's my understanding that the full complements of the productions were provided and also acknowledged.

40

**Q:** Okay. So, just so to make sure that I'm understanding what you're saying, there are no other records that – other than those that you've produced, you're not aware of any additional records in your possession, custody, or control that are responsive to the subpoena?

**A:** I'm not aware of any other additional records that have not been provided or produced as requested.

**Q:** Thank you very much. Okay. And, in fact, to memorialize that, to memorialize the completeness of your production, you completed and signed at least an affidavit; is that correct?

**A:** There is an affidavit that I did sign.

**Q:** Okay. And so if I can approach you again, and I'll put one up on the screen, this is – do you recognize that as a copy of the affidavit that you signed?

**A:** This is my signature.

**Q:** Okay. And is that the affidavit? Feel free to take as much time as you would like to review it.

**A:** Yes. To my knowledge this is it. I mean, I signed it.

**Q:** And presumably you reviewed it before signing it, and you know that it represents that this is a full and complete and thorough – full –let me see and just go ahead read it.

It says paragraph 4, in response to the subpoena, "I, LaToya Cantrell, conducted and/or directed others on my behalf, a complete and thorough search of all areas within my direct and/or constructive possession where records concerning the above-mentioned entities might be found." Do you see that?

**A:** Uh huh (affirmative response). Yes, sir.

**Q:** And then it goes on to say, "All responsive records with some Bates numbers, some identification[] marks, were provided to the government." Correct?

**A:** That is correct. And was a response from government said that the information was accepted.

41

**Q:**    All right. And then going on to say, "To my knowledge, no documents have been withheld."

**A:**    To my knowledge.

## B.    <u>THE OFFENSE:</u>

159.    On or about June 28, 2024, in the Eastern District of Louisiana, the defendant, **LATOYA CANTRELL**, while under oath and testifying in a proceeding before a federal grand jury of the United States in the Eastern District of Louisiana, knowingly did make the following false material declarations:

    a.  **CANTRELL** produced all records responsive to the July 18 subpoena maintained on her personal devices;

    b.  **CANTRELL** was unaware of additional records in her possession, custody, or control that had been withheld from production in response to the July 18 subpoena; and

    c.  To **CANTRELL's** knowledge, no responsive documents had been withheld from production.

160.    In truth and in fact, when **CANTRELL** made these statements in her sworn affidavit, **CANTRELL**:

    a.  Knew she did not produce all records responsive to the July 18 subpoena maintained on her personal devices;

    b.  Was aware of additional records in her possession, custody, or control that had been withheld from production in response to the July 18 subpoena; and

    c.  Was aware of responsive documents that had been withheld from production.

All in violation of Title 18, United States Code, Section 1623.

## NOTICE OF FORFEITURE

1.     The allegations of Counts 1 through 14 and 16 of this Superseding Indictment are incorporated by reference as though set forth fully herein for the purpose of alleging forfeiture to the United States.

2.     As a result of the offenses alleged in Counts 1 through 14 and 16, the defendants, **JEFFREY PAUL VAPPIE, II** and **LATOYA CANTRELL**, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to said offenses.

3.     If any of the above-described property, as a result of any act or omission of the defendant:

a.     cannot be located upon the exercise of due diligence;

b.     has been transferred or sold to, or deposited with, a third person;

c.     has been placed beyond the jurisdiction of the Court;

d.     has been substantially diminished in value; or

e.     has been commingled with other property which cannot be subdivided without difficulty;

the United States shall seek a money judgment and, pursuant to Title 21, United States Code, Section 853(p), forfeiture of any other property of the defendant up to the value of said property.

A TRUE BILL:

███████████████

MICHAEL M. SIMPSON
ACTING UNITED STATES ATTORNEY

JORDAN GINSBERG
Assistant United States Attorney

NICHOLAS D. MOSES
Assistant United States Attorney

New Orleans, Louisiana
August 15, 2025

FORM OBD-34

No. 24-cr-165 "D"

UNITED STATES DISTRICT COURT

Eastern __ District of __ Louisiana __

__ Criminal __ Division

THE UNITED STATES OF AMERICA

vs.

JEFFREY PAUL VAPPIE, II
LATOYA CANTRELL

SUPERSEDING INDICTMENT FOR CONSPIRACY
TO COMMIT WIRE FRAUD, WIRE FRAUD,
CONSPIRACY TO OBSTRUCT JUSTICE,
OBSTRUCTION OF JUSTICE, FALSE STATEMENTS,
AND FALSE DECLARATIONS BEFORE GRAND JURY

VIOLATIONS:   18 U.S.C. § 371
              18 U.S.C. § 1343
              18 U.S.C. § 1512(c)(1)
              18 U.S.C. § 1512 (c)(2)
              18 U.S.C. § 1512(k)
              18 U.S.C. § 1001(a)(2)
              18 U.S.C. § 1623

A true bill.

_____

Filed in open court this _____ day of
_____ A.D. 2025.

_____
Clerk

Bail, $ _____

JORDAN GINSBERG
Assistant United States Attorney