**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 24-165** |
| **v.** | * | **SECTION: "D"** |
| **JEFFREY PAUL VAPPIE, II** | * | |
| **LATOYA CANTRELL** | | |
| | * | |

\* \* \*

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF ITS MOTION TO ADMIT INTRINSIC EVIDENCE OR, ALTERNATIVELY, NOTICE OF INTENT TO INTRODUCE "OTHER ACT" EVIDENCE PURSUANT TO RULE 404(b) OF THE FEDERAL RULES OF EVIDENCE**

**NOW INTO COURT** comes the United States of America, through the undersigned Assistant United States Attorneys, and hereby seeks to admit at trial as intrinsic evidence that the defendants knowingly and without mistake continued their obstruction beyond the conduct referenced in the superseding indictment by withholding material responsive to a lawfully served grand jury subpoena. Alternatively, the government seeks to admit this information as evidence of "other acts" under Federal Rule of Evidence 404(b). The government also intends to admit in accordance with Rule 404(b) evidence of defendant LaToya Cantrell's misuse of campaign funds as evidence of "other acts."

## I.   FACTUAL BACKGROUND

On August 15, 2025, a grand jury charged Jeffrey Paul Vappie, II, and LaToya Cantrell in an eighteen-count superseding indictment. Both defendants were charged with one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 371 and 1343. (*See* Doc. No. 34.) Vappie was charged with twelve counts of wire fraud, in violation of 18 U.S.C. § 1343, and Cantrell was charged in six of those counts. Vappie and Cantrell were also charged with one count

of conspiracy to obstruct justice, in violation of 18 U.S.C. § 1512(k).  Vappie was charged with one count of making false statements to law enforcement authorities, in violation of 18 U.S.C. § 1001.  Finally, Cantrell was charged with one count of obstruction of justice, in violation of 18 U.S.C. § 1512(c)(1), and two counts of making a false declaration before a grand jury, in violation of 18 U.S.C. § 1623.

Relevant to the instant pleading, the coconspirators devised a scheme "to defraud and obtain money and property from the City of New Orleans and NOPD by means of materially false and fraudulent pretenses, representations, and promises" by converting to their personal use money and property to which they were not entitled and thereafter concealing the scheme.  (*See id.* at 13.) The obstruction conspiracy alleges that Cantrell and Vappie conspired to obstruct the due administration of justice from at least October 2021 through the date of the superseding indictment, August 15, 2025.  (*See id.* at 30.)  Cantrell and Vappie's obstructive conduct included destroying and withholding evidence, creating false evidence, using a secure messaging application to communicate, influencing subordinates, intimidating citizens, lying to law enforcement authorities, and making false statements to a grand jury.  (*See id.* at 30-31.)  The superseding indictment further alleged that Cantrell violated the law by withholding from production certain records and materials requested pursuant to a July 18, 2023 federal grand jury subpoena and thereafter providing an affidavit and grand jury testimony that falsely claimed she had not withheld responsive material.  (*See id.* at 13, 34-42 (Counts 16-18).)  The subpoena sought, and required, Cantrell to produce, *inter alia*, "[a]ll documents, records, and/or correspondence concerning any gift or thing of value, including, but not limited to, meals, jewelry, clothing, and political (*i.e.*, campaign) donations provided to you by Jeffrey Vappie.  This request expressly includes any pictures of any such gifts or things of value provided to you by Jeffrey Vappie[.]"  (*Id.* at 35.)

After producing materials purportedly responsive to the grand jury subpoena, Cantrell on numerous occasions affirmed that her production was complete and that she was unaware of any remaining responsive materials in her possession.   Specifically, Cantrell produced to the government an affidavit signed under oath and penalty of perjury that stated, among other things:

- "The documents that have been produced are all the responsive documents in my possession, custody, and control.  To my knowledge, no documents have been withheld."

- "Other than the documents set forth in Paragraph 5 above, I am unaware of the existence of any additional documents that are responsive to the subpoena."

(*Id.* at 38.)  Cantrell's production included a photograph of a single diamond ring, which she made available to the government for inspection through counsel.

On June 8, 2024, Cantrell testified under oath before the grand jury.  Cantrell testified that she was aware of the subpoena and the material it requested.  (Doc. No. 34 at 40.)  She confirmed she signed the affidavit.  Cantrell also confirmed she was unaware of any additional, unproduced material responsive to the subpoena.  (*See* Doc. No. 34 at 41.)  While before the grand jury, Cantrell further acknowledged she had a continuing duty to produce responsive materials in the future should she find them.

Similarly, Vappie received a grand jury subpoena that required him to produce various categories of documents, including "[a]ll documents, records and/or correspondence concerning any gift or thing of value you provided to LaToya Cantrell, including, but not limited to, meals, jewelry, clothing, and political (*i.e.*, campaign) donations.  This request expressly includes pictures of any such gifts or things of value provided by you to LaToya Cantrell."  In March 2024, Vappie responded by producing approximately 994 pages of materials.  None of the records concerned, referenced, or acknowledged the existence of any gift he gave Cantrell.  As part of his production,

3

Vappie provided a sworn, notarized affidavit stating that he was "unaware of additional records in my possession responsive to the subpoena and have not knowingly withheld from production any responsive materials."[1]

In contrast to representations Vappie and Cantrell made in response to the grand jury subpoenas, the indictment alleges, and provides documentary evidence, that by June 11, 2022, Vappie had given Cantrell two rings, a small diamond ring and a larger golden ring:



---

[1] The subpoenas, affidavits, and transcript have been produced to the defense (USA-066434-50 (Cantrell subpoena); USA-068134-41 (Vappie subpoena); USA-074523-25 (Cantrell aff.); USA-074522 (Vappie aff.); USA-092367-403 (Cantrell transcript)).  All materials referenced or cited in this pleading can be provided to the Court upon request.

(*Id.* at 32.)  Details of one of those photographs (below left) show that the golden ring includes the NOPD crescent and star logo, with the letters "NOPD" on the crescent.  The golden NOPD ring resembles a golden ring Vappie previously wore in an NOPD photograph (below right).[2]





Jeffrey Vappie II

In Octboer 2023, Cantrell produced the smaller diamond ring to the government for inspection and photograph, as she noted in her October 25, 2023 affidavit for the grand jury.  In response to the subpoena served on him, Vappie failed to produce any records related to the diamond ring.  To date, neither Vappie nor Cantrell has acknowledged the existence of the golden NOPD ring, nor have they produced any evidence, including photographs, about it in response to the subpoena.

### A.  Obstruction and Ongoing Withholding of Evidence

Overwhelming evidence, however, indicates Cantrell possessed both rings at the time she received the subpoena, and she continues to possess them.  As shown in the excerpts below (and consistent with the WhatsApp messages Cantrell and Vappie exchanged on June 11, 2022),

---

[2] The photograph was in a 2000-2005 book of NOPD officers.  The red circles in this and other photographs were added for emphasis.

Cantrell's social media shows her wearing the golden NOPD ring on her right hand as early as December 2021 and the diamond ring on her left-hand ring finger as early as January 2022:

 

Cantrell began wearing the two rings mere months after her October 2021 trip to Scotland with Vappie that was, in Vappie's words, "where it all started." (*See* Doc. No. 34 at 8.)

Since the superseding indictment, Cantrell has continued to wear the rings in public and as part of official events. For example, on October 2, 2025, a photograph of Cantrell wearing both rings was posted on her Facebook account.

6



A photograph of Cantrell, wearing the golden NOPD ring and touching her official portrait featuring both the diamond ring and the golden NOPD ring, was posted in December 2025:[3]



The government now seeks to present, as evidence intrinsic to the charged crimes, information concerning the golden NOPD ring and Cantrell's continued possession and display of it. Alternatively, the government hereby provides notice of its intent to present this evidence as relevant "other acts" admissible under Federal Rule of Evidence 404(b).

---

[3] *See* Arts New Orleans, https://www.artworkarchive.com/profile/artsneworleans/artwork/mayor-latoya-cantrell-portrait (last visited Mar. 31, 2026).

**B. Misuse of Campaign Funds for Personal Benefit**

The government also intends to offer evidence of a scheme similar to the charged scheme to defraud that Cantrell employed involving her personal use of money that did not belong to her: campaign donations. Specifically, Cantrell used campaign funds for two categories of personal expenses, over the objection of her subordinate, and concealed it with false documentation and false solicitations to prospective donors that the funds would be used to help her reelection efforts and to hold public office. For the first category, she made monthly purchases of alcohol during the first months of the COVID-19 pandemic and mischaracterized their purpose on financial disclosures made to the Louisiana Board of Ethics. For the second category, Cantrell spent campaign funds to purchase personal clothing and then concealed the personal nature of the expenditures by manufacturing a sham consulting arrangement. In both cases, Cantrell was confronted by an associate familiar with her campaign and the Cantrell campaign accounts (hereinafter, Associate A). This individual was the same person who confronted Cantrell about misusing public funds and resources for her personal activities with Vappie, as described in the superseding indictment (*see* Doc. No. 34 at 18-19). Just as she disregarded Associate A's admonitions with respect to misusing public funds and resources related to her co-defendant, Cantrell also disregarded Associate A's concerns about her misuse of campaign funds and subsequent coverup.

**1. Alcohol Purchases with Campaign Funds**

On March 11, 2020, in her capacity as Mayor, Cantrell declared a state of emergency due to the COVID-19 pandemic.[4] A subsequent series of government-issued guidelines limited the

---

[4] *See, e.g.,* Katelyn Umholtz, *New Orleans mayor declares state of emergency after officials confirm 13 cases*, nola.com, Mar. 11, 2020, available at https://www.nola.com/news/coronavirus/new-orleans-mayor-declares-

circumstances and number of people allowed to congregate.[5]  The restrictions lasted, in various forms, throughout the rest of 2020 and the first months of 2021.

On at least thirteen occasions between March 2020 and December 2020, Cantrell personally purchased more than $9,000 worth of alcohol from a local liquor store near her residence using campaign funds.  Receipts reflect Cantrell purchased the following:

| | |
|---|---|
| **March 18, 2020:** | 8 bottles of Veuve Clicquot champagne, 4 bottles of Guigal Côtes du Rhône red wine (2016) (totaling $619.36) |
| **April 18, 2020:** | 12 bottles of Veuve Clicquot champagne, 6 bottles of Guigal Côtes du Rhône red wine (2016), 6 bottles of Urban South Brewing Holy Roller IPA (totaling $939.47) |
| **May 23, 2020:** | 11 bottles of Veuve Clicquot champagne, 1 case of Guigal Côtes du Rhône red wine (2016) (totaling $918.76) |
| **June 13, 2020:** | 8 bottles of Veuve Clicquot champagne, 1 bottle of Ayala Brut Majeur champagne, 6 bottles of Urban South Brewing Holy Roller IPA (totaling $610.64) |
| **July 11, 2020:** | 12 bottles of Veuve Clicquot champagne, 24 bottles of Urban South Brewing Holy Roller IPA (totaling $829.41); 1 Odi Moises Praline in a Cookie Mini Jar, 1 champagne recorker (totaling $14.91) |
| **August 8, 2020:** | 1 case of Veuve Clicquot champagne, 1 case of Gnarly Barley Jucifer IPA (totaling $702.27) |
| **September 2, 2020:** | 1 case of Veuve Clicquot champagne (totaling $656.30) |
| **October 1, 2020:** | 7 bottles of Veuve Clicquot rosé, 2 bottles of Veuve Clicquot champagne (totaling $538.20) |
| **October 10, 2020:** | 1 case of Veuve Clicquot champagne (totaling $616.90) |

---

state-of-emergency-after-officials-confirm-13-cases/article_68df3890-63e5-11ea-a4ca-2f0e871e7eaf.html        (last visited Jan. 12, 2026).)

[5]  *See, e.g.*, City of New Orleans, *COVID-19 Phase Progressions*, available at https://nola.gov/archived/health/coronavirus/safe-reopening/phases/ (last visited Jan. 2, 2026); City of New Orleans, *Mayor Cantrell Announces New Phase Two Restrictions in Response to Covid-19 Pandemic, Recent Increase in Cases And Hospitalizations*, July 8, 2020, available at https://nola.gov/next/mayors-office/news/articles/july-2020/mayor-cantrell-announces-new-phase-two-restrictions-in-response-to-covid-19-pandemic,-recent-increas/ (last visited Jan. 2, 2026); *see also* Husch Blackwell, *Louisiana: State-by-state COVID-19 Guidance*, available at https://www.huschblackwell.com/louisiana-state-by-state-covid-19-guidance (last visited Jan. 2, 2026).

**October 25, 2020:**    12 bottles of Veuve Clicquot rosé (totaling $735.11)

**November 7, 2020:**    4 bottles of Veuve Clicquot rosé, 4 bottles of Veuve Clicquot champagne, 4 bottles of Laurent Perrier Brut La Cuvée champagne (totaling $638.83)

**November 27, 2020:**  1 case of Veuve Clicquot champagne (totaling $616.90)

**December 24, 2020:**  11 bottles of Veuve Clicquot champagne, 2 wine bags, 1 bottle of Crown Royal Blended Canadian Whisky, 1 bottle of Patron Tequila Silver (totaling $665.07)

In her annual campaign disclosure to the Louisiana Board of Ethics, filed in February 2021, Cantrell characterized the transactions as "food and beverage for supporters/donors," despite the absence of in-person campaign events during that time period.[6]  This February 2021 filing was approximately three months before Vappie joined Cantrell's executive protection unit, and six months before the start of the Count 1 conspiracy.  (*See* Doc. No. 34 at 6, 13.)

Cantrell also purchased multiple bottles of champagne on several occasions in 2021 using funds from the campaign account.  This included 12 bottles of champagne on January 9, 2021 (totaling $540.50), 12 bottles of champagne on February 8, 2021 (totaling $616.90), 3 bottles of champagne, 2 bottles of red wine, and 1 bottle of cognac on February 21, 2021 (totaling $343.52). Campaign records show no in-person events during the period of these alcohol purchases.  A campaign report filed on April 2, 2021, nonetheless described these personal alcohol expenses as "meals and entertainment" or "food, bev for donors."[7]

When reviewing records of Cantrell's expenditures, Associate A expressed concern with Cantrell's liquor purchases with campaign funds when Covid-19 restrictions prevented in-person

---

[6] *See* 2020 Annual Candidate's Report, LaToya Cantrell, Sched. E-1, pp. 47-49 (filed Feb. 18, 2021), available at https://www.ethics.la.gov/CampaignFinanceSearch/ShowEForm.aspx?ReportID=96830 (last visited Mar. 1, 2026).
[7] *See* Candidate's Report, LaToya Cantrell, Sched. E-1, pp. 31-32 (filed Apr. 2, 2021), available at https://eap.ethics.la.gov/CFSearch/LA-97771.pdf (last visited Mar. 1, 2026).

events.  In particular, on December 30, 2021, Cantrell and Associate A exchanged the following text messages:[8]

**Cantrell:**       Hey [first name of Associate A].  I need to get Martin Wine Cellar the credit card number.  They upgraded their system and lost the card on file.  Thanks!

[Picture of business card of point of contact at Martin Wine Cellar]

[First name of Martin Wine Cellar point of contact] is the contact

**Associate A:**  What is it for?  I have to put every purchase in our reporting system.  Can give them number but I need advance notice of all purchases

Waiting till report is due and trying to figure that out then does not work

I can create a form with the required info or I can just call the number in every time.

Last time you were buying like 1k in champaign a month and we weren't able to have in person anything.

And I didn't know until way after

Cantrell and Associate A continued their exchange on January 5, 2022:[9]

**Associate A:** What has changed is that campaign spending is being done in a vacuum and then months later I am given receipts for things like hotel upgrades, flight first class upgrades, $500 bottles of wine.  Not sure how any of these qualify.  An example That could work is that your family was catered to, bussed around on Election Day because they were literally campaigning.

A test is if the expense is being directed to campaign only or mostly bc it isn't budgeted for elsewhere – fails the test

**Cantrell:**       Got it.  Let me know what that gap is.  And then who should it go to if campaign does not qualify?

The next day, January 6, 2022, Cantrell further explained in a text message to Associate A, "I want to make sure that money I am raising is also accommodating me while I am doing this job.  Comfort

---

[8] The messages were previously produced to the defendants.  (*See* USA-094945-47.)
[9] The messages were previously produced to the defendants.  (*See* USA-094961-62.)

is not a luxury and I am not taking advantage." Minutes later, Associate A sent Cantrell a text stating, "The finance reports I file can say things like 'travel accommodations' but let's be clear here. They are coming for you. There are people who can request every invoice and challenge extravagant spending at any time. Protecting you is part of my job and I am doing the work."[10] This was only months before Associate A also warned Cantrell in April 2022 that using public funds for her personal travel with Vappie was illegal. (*See* Doc. No. 34 at 18-19.)

### 2. Clothing Purchases with Campaign Funds

Beginning in 2017, when she was first elected mayor, Cantrell met an individual who became her hair stylist, and Cantrell caused the stylist and the stylist's businesses to be paid from the Cantrell campaign account. Early in their relationship, Cantrell also paid the stylist personally to purchase clothes for Cantrell.

As time went on, Cantrell arranged for the campaign account to pay the stylist increasingly exorbitant amounts, which included money for Cantrell's clothes. The payments went to three accounts: the stylist's personal bank account, a business account in the name of the stylist's hair business, and a business account in the name of a consulting business the stylist opened in 2017. Notably, Cantrell was the only paying client of the stylist's purported consulting business. Cantrell's campaign finance reports mischaracterized the purpose of the payments to the stylist through the three accounts as "image consulting." This pattern continued until late 2022, when media outlets began reporting on the FBI's investigation into Cantrell's misuse of campaign funds.[11] During the entire time Cantrell misused campaign funds, people with knowledge of the

---

[10] The messages were previously produced to the defendants. (*See* USA-094972-73.)

[11] *See, e.g.*, John Simerman & Gabriella Killett, *Federal grand jury probing purchases by LaToya Cantrell's image consultant*, nola.com, Nov. 17, 2022, available at https://www.nola.com/news/latoya-cantrell-stylist-subject-of-federal-subpoenas/article_9839e50a-66ca-11ed-bb25-bf48bd1fe79a.html (last visited Jan. 13, 2026).

campaign account advised her that the arrangement was improper, but Cantrell continued unabated.

Over time, Cantrell caused the campaign account to pay the stylist and entities under the stylist's control increasingly large amounts, while Cantrell's personal payments dwindled:

- In 2017, the campaign paid the stylist $28,470, and Cantrell personally paid the stylist $706.

- In 2018, the campaign paid the stylist $30,700, and Cantrell personally paid the stylist $10,778.

- In 2019, the campaign paid the stylist $38,000, and Cantrell personally paid the stylist $11,060.

- In 2020, the campaign paid the stylist $47,000, and Cantrell personally paid the stylist $4,750.

- In 2021, the campaign paid the stylist $73,389, and Cantrell personally paid the stylist $170.[12]

- From January through September 2022, the campaign paid the stylist $42,000, and Cantrell personally paid nothing.

In total, from 2017 through late 2022, the campaign paid the stylist approximately $259,559, while Cantrell personally paid the stylist only $27,464.

Social media photographs often showed Cantrell wearing clothing that matched items the stylist purchased using campaign funds. In the representative examples below, several items

---

[12] On October 23, 2021, Associate A asked Cantrell whether Cantrell could pay the stylist as much as $500 per month for a potential personal loan of $15,000 to pay for Cantrell's "gowns and stuff," and Cantrell said, "No on $500 per month personal."

purchased from Ann Taylor by the consulting company account and the stylist's personal account are consistent with clothing Cantrell wore publicly:[13]

    a.  On March 31, 2021, the stylist purchased (1) a straight pant in crosshatch romantic rouge and (2) a one-button blazer in crosshatch romantic rouge, an outfit Cantrell wore in posts on her Instagram account on July 1, 2021:







---

[13] The pictures of the articles of clothing purchased from Ann Taylor are provided for visual comparison only. They do not account for differences in sizes or cut or changes in price. The stylist purchased clothes for Cantrell using campaign funds at numerous retailers in addition to Ann Taylor.

b.  On May 7, 2022, the stylist purchased (1) a pinstripe button front top in dazzling blue and (2) "easy ankle" pants in dazzling blue, an outfit Cantrell's Instagram account showed her wearing on May 19, 2022:







c. On June 11, 2022, the stylist purchased (1) a cutaway blazer in linen blend twill bubblegum, (2) high-rise straight pants in linen blend twill bubblegum, and (3) a sleeveless square neck top in linen blend twill bubblegum, an outfit Cantrell's Instagram account showed her wearing in France on July 14, 2022:







Financial records and text message records confirm that Cantrell arranged for the Cantrell campaign account to pay the stylist for her clothes.  For example, on August 3, 2022, Cantrell and her stylist exchanged the following text messages:



---

[14] In the two days before Cantrell asked the stylist these questions about the amount owed, Associate A texted Cantrell that the campaign owed the stylist $6,000 for the coming month, but the campaign recently had a check bounce and did not have the funds for that payment.

17

Notably, just two days before the exchange above, the campaign's account balance was under $800. After Cantrell raised additional funds, the campaign paid the stylist's consulting company $5,000 on August 19, 2022. The campaign also paid the consulting company $7,000 on September 30, 2022. Cantrell's campaign reports listed both payments as "image consulting."[15]

While the examples from Ann Taylor date from March 2021 through August 2022, financial records indicate the misuse of campaign funds for Cantrell's clothing began as early as

---

[15] *See* 2022 Annual Candidate's Report, LaToya Cantrell, Sched. E-1, pp. 24-25 (filed Feb. 15, 2023), available at https://www.ethics.la.gov/CampaignFinanceSearch/ShowEForm.aspx?ReportID=109873 (last visited Mar. 1, 2026).

2017.  In the earlier years, the stylist occasionally sent Cantrell itemized bills for purchases, which the campaign mostly reimbursed.  For example, on July 9, 2019, the stylist texted Cantrell an itemized list, including approximately 40 items of clothing for Cantrell and a family member, three charges for alterations, and dry cleaning, for which Cantrell owed the stylist $3,803.  Cantrell responded that Associate A was "preparing check for you to cover these expenses."  That same day, the Committee to Re-Elect Latoya Cantrell issued a $7,000 check to the stylist for "June/July consulting."

As with the charged fraudulent acts, Cantrell was on notice that using campaign funds to purchase clothes was prohibited by state ethics regulations and that soliciting campaign donations under false pretenses constituted fraud.  At least as early as 2018, Cantrell knew that campaign funds could not be used to pay for Cantrell's wardrobe and had to be limited to the stylist's services.  In addition to Cantrell's annual state ethics training, on May 4, 2022, Cantrell attended a campaign finance disclosure training through the Louisiana Ethics Administration Program.[16] She also knew because Associate A repeatedly told her so.

## II.   LAW & ARGUMENT

The government now seeks to present, as evidence intrinsic to the charged crimes, information concerning the rings and Cantrell's continued possession and display of them after the return of the superseding indictment.  Alternatively, the government hereby provides notice of its intent to present this evidence as relevant "other acts" admissible under Federal Rule of Evidence Rule 404(b).  The government also provides notice of its intent to present at trial evidence of Cantrell's soliciting campaign funds under false pretenses, misuse of those campaign funds, and

---

[16] A certificate of attendance reflects that Cantrell observed a video that, among other things, reminded candidates and officeholders each campaign expense required "detailed information as to how the expenditure was related to the campaign or the holding of public office."

subsequent filing of false campaign finance reports to the Louisiana Board of Ethics as relevant "other acts" admissible under Rule 404(b).

### A. Intrinsic evidence

The proper test to apply in deciding whether "other acts" evidence is admissible depends on whether the evidence in question is intrinsic or extrinsic. *See United States v. Sumlin,* 489 F.3d 683, 689 (5th Cir. 2007); *United States v. Williams*, 900 F.2d 823, 825 (5th Cir. 1990). Evidence of an act is intrinsic "when it and evidence of the crime charged are inextricably intertwined, or both acts are part of a single criminal episode, or it was a necessary preliminary to the crime charged." *Sumlin*, 489 F.3d at 689 (citing *United States v. Freeman*, 434 F.3d 369, 374 (5th Cir. 2005)); *see also United States v. Age*, 136 F.4th 193, 220 (5th Cir. 2025) ("Evidence is considered intrinsic if it is an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, if it was inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime at the trial.") Further, intrinsic evidence is admissible to "complete the story of the crime" by proving the immediate context of events in time and place, and to help the jury "evaluate all of the circumstances under which the defendant acted." *United States v. Rice*, 607 F.3d 133, 141 (5th Cir. 2010) (citation omitted). The Fifth Circuit gives "greater latitude in classifying evidence as intrinsic" where a conspiracy has been charged. *See United States v. Girod*, 646 F.3d 304, 320 (5th Cir. 2011) (internal citations omitted); *see also United States v. Age*, No. 16-32, 2021 WL 6135570, at *4 (E.D. La. Dec. 29, 2021), *aff'd*, 136 F.4th 193 (5th Cir. 2025). The Fifth Circuit has held routinely that where evidence is "intrinsic" to the offenses charged, Rule 404(b) does not limit its admissibility. *See United States v. Shaughnessy*, 157 F.4th 378, 388 (5th Cir. 2025) (quoting *United States v. Yi*, 460 F.3d 623, 632 (5th Cir. 2006)); *United States v. Crawley*, 533 F.3d 349,

354 (5th Cir. 2008) ("Rule 404(b) is only implicated when the offered evidence is extrinsic; evidence intrinsic to the charged offense does not implicate the rule."); *Sumlin*, 489 F.3d at 689; *United States v. Powers*, 168 F.3d 741, 749 (5th Cir. 1999).

### B. Extrinsic evidence under Rule 404(b)

If the Court finds the evidence of other wrongful acts to be "extrinsic," it must evaluate the admissibility of that evidence under Rule 404(b) of the Federal Rules of Evidence which provides, in pertinent part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . .

Fed. R. Evid. 404(b).

In analyzing the admissibility of Rule 404(b) evidence, the Fifth Circuit follows the two-part test developed in *United States v. Beechum*, 582 F.2d 898, 909-18 (5th Cir. 1978) (en banc). *See United States v. Sanders*, 343 F.3d 511, 517-18 (5th Cir. 2003). The first prong of the *Beechum* test is to determine whether the evidence is "relevant to an issue other than the defendant's character," such as intent, knowledge, plan, pattern of conduct, or motive. *See United States v. Dowl*, No. 08-164, 2009 WL 1507412, at *3 (E.D. La May 27, 2009) (Vance, J.) (quoting *Beechum*, 582 F.2d at 911). If the evidence is relevant to such an issue, the Court must then determine whether the evidence "possess[es] probative value that is not substantially outweighed by its undue prejudice and . . . meet[s] the other requirements of rule 403." *Id*. (quoting *Beechum*, 582 F.2d at 911) (emphasis added). At this second step, the Fifth Circuit requires the consideration of four factors: "(1) the government's need for the extrinsic evidence, (2) the similarity between the extrinsic and charged offenses, (3) the amount of time separating the two offenses, and (4) the court's limiting instructions." *Age*, 136 F.4th at 220. The Fifth Circuit has held that "all probative

21

evidence is by its very nature prejudicial" and as a result should only be excluded "sparingly." *Powers*, 168 F.3d at 759 (citations omitted).

Finally, regardless of whether the evidence is intrinsic or extrinsic, evidence of those acts is relevant only if there is proof that the acts actually occurred, and the defendant was the actor who committed them. *See Dowl*, 2009 WL 1507412 at *3 (citing *Huddleston v. United States*, 485 U.S. 681, 689 (1988)). A court is to evaluate this inquiry by determining whether "the jury could reasonably find the conditional fact . . . by a preponderance of the evidence." *Huddleston*, 485 U.S. at 690; *Beechum*, 582 F.2d at 913. To meet this standard, the government need only provide "*some evidence* that the defendant committed the bad act." *Crawley*, 533 F.3d at 354 (emphasis in original); *United States v. Gonzalez-Lira,* 936 F.2d 184, 189 (5th Cir. 1991). "A court is not required to make a preliminary finding that an extrinsic act occurred when deciding its relevance." *Age*, 2021 WL 6135570 at *5.

### C. The golden NOPD ring evidence is intrinsic.

The defendants' continued withholding of material responsive to the grand jury subpoena—namely, the golden NOPD ring, which is evidence of a gift Vappie gave Cantrell—is intrinsic to the obstruction charged in the superseding indictment. The defendants knew about this obstruction by withholding the golden NOPD ring before and after (1) Vappie and later Cantrell each made an incomplete return to the grand jury that omitted this and other relevant evidence, (2) they each gave false affidavits to the grand jury certifying completeness of their respective productions, (3) Cantrell testified falsely to the grand jury about the completeness of her production, and even (4) after the grand jury issued the superseding indictment. The photographs discussed above in section I(A) show that Cantrell's obstruction was knowing, not accidental; Cantrell did not misplace or lose possession of the golden NOPD ring but instead chose to display

it prominently and publicly.  This long-running withholding of critical evidence, all while Cantrell and Vappie knew what the golden NOPD ring was and saw it regularly on Cantrell's finger, is "inextricably intertwined" with and "completes the story" of Vappie and Cantrell's conspiracy to obstruct justice and Cantrell's individual obfuscatory efforts alleged in Counts 14, 16, 17, and 18. Put another way, Cantrell's actions after the superseding indictment are a continuation of their obstructive conduct—and the criminal conspiracy she and Vappie created and nurtured—in the years prior.  As such, they are part of a "single criminal episode" of the obstruction and further evidence of the perjury alleged in the superseding indictment.  They also "complete the story" of the counts that relate to Vappie and Cantrell's attempts to conceal their actions and inhibit a grand jury investigation from exposing their scheme.

### D.  The golden NOPD ring evidence is also admissible under Rule 404(b).

In the event the Court concludes the defendants' post-indictment actions related to the rings Vappie gave Cantrell, especially the withholding of the golden NOPD ring, are not admissible as intrinsic to the crimes charged, they should nevertheless be admitted as "other acts" evidence pursuant to Federal Rule of Evidence 404(b).  Accordingly, the government respectfully provides Vappie and Cantrell notice of its intent to present such evidence.

As an initial matter, the defendants' continuing obstruction concerning the golden NOPD ring is relevant to issues other than their character.  Vappie, for example, continued to withhold from production any material acknowledging the existence of either ring, such as purchase records for the diamond ring, even though his codefendant regularly wore them in public long after he falsely certified in April 2024 that the grand jury subpoena return was complete.  Cantrell's continued possession and display of the golden NOPD ring, and her withholding of it in response

23

to the subpoena, provides clear, relevant evidence of Cantrell's intent, knowledge, pattern of conduct, and absence of mistake. *See Beechum*, 582 F.2d at 911.

The defendants had innumerable opportunities to respond to clear, specific requests in grand jury subpoenas. Both failed. Cantrell, for example, failed to do so in her original production. She failed again by providing a false affidavit. She failed a third time by testifying falsely before the grand jury. Cantrell's contempt for the grand jury process by continuing to withhold evidence, even after her indictment, was on display as she publicly flaunted her possession of the rings with every gesture of her hand. This obstructive and cavalier behavior constitutes her fourth failure. Given the totality of the circumstances, Cantrell engaged in a repeated pattern of obfuscatory conduct. It also helps prove that Cantrell's prior failures and false statements were not the result of a mistake. In short, both precedent and the facts of this case establish that Cantrell's obstructive post-indictment conduct regarding the golden NOPD ring and Vappie's continued refusal to acknowledge either ring's existence are probative under the first part of the *Beechum* test.

With respect to *Beechum*'s second prong, the facts underlying this motion are highly probative of the defendants' knowledge and intent and outweigh any prejudicial effect against them. In this case, the government seeks only to admit a limited quantum of evidence. The evidence, including the brazen flaunting by Cantrell of the golden NOPD ring Vappie gave her, all while withholding its existence from the grand jury, is vital to proving the defendants' intent. Each defendant placed this intent squarely at issue by pleading not guilty and proceeding to trial. Moreover, their intent is the crucial issue regarding Cantrell and Vappie withholding of responsive evidence.

The jury will need to decide if Cantrell's and Vappie's failures to be truthful—both in the production of evidence and false attestations—were the result of oversight or mistake, rather than

24

nefarious intent.   Cantrell's conduct after her grand jury appearance proves otherwise. Additionally, the conduct at issue, namely Cantrell's continued obstruction as evidenced by possessing and displaying the golden NOPD ring, occurred close in time to the actions for which the defendants were indicted.   Indeed, her conduct occurred less than six months after the conclusion of the time period charged in the superseding indictment.  *See, e.g.*, *United States v. Hitsman*, 604 F.2d 443 (5th Cir. 1979) (affirming admission of evidence under 404(b) that took place two or three years before the charges at issue).

To the extent the Court is concerned about the effect of this evidence, the Fifth Circuit has approved the use of limiting instructions to ward off potential prejudice.  *See Crawley*, 533 F.3d at 518; *United States v. Nguyen*, 504 F.3d 561, 574 (5th Cir. 2007); *Layne*, 43 F.3d at 134. Consequently, Cantrell's post-indictment obstruction and related public display of material responsive to a grand jury subpoena is not unduly prejudicial or of "an inflammatory nature" that could prompt a jury verdict on an improper basis.  Accordingly, due to the highly probative value of this evidence, and the fact that it is not substantially outweighed by any prejudicial effect, this evidence satisfies the Fifth Circuit's test in *Beechum*, and the Court should admit it.  *See Dowl*, 2009 WL 1507412, at *7.

### E.  Cantrell's misuse of campaign funds is admissible under Rule 404(b).

Additionally and independently, during her time in office Cantrell solicited campaign donations under false pretenses and then misused those funds by causing expenditures from her campaign account to purchase items unrelated to her position or the holding of public office.  She then misrepresented the purpose of those expenditures in filings with the Louisiana Board of Ethics.   The Court should admit evidence of these bad acts at trial because they constitute admissible extrinsic evidence that satisfy both prongs of the *Beechum* test.

25

First, Cantrell's solicitation and subsequent use of campaign funds to purchase alcohol and clothes for her personal use and clothes, and her subsequent attempts to conceal the purpose of those purchases, bear on her intent, knowledge, and plan regarding the charged crimes. The misuse of campaign funds to purchase Cantrell's clothing and personal alcohol, instead of using her limited personal funds, is also relevant to her motive. Moreover, it establishes a pattern of conduct and demonstrates an absence of mistake. Cantrell is charged with, among other things, engaging in a conspiracy (and perpetrating substantive offenses) in which she exploited her power and authority over the people and funds at her disposal for her personal benefit, all while falsifying documents to hide the true nature of those expenses. Just as she instructed her subordinates to book travel for Vappie, a fact Cantrell falsely certified post-travel as being business-related, Cantrell also misused campaign funds for personal expenses, while falsely characterizing such expenses in subsequent campaign reports as being for "supporters/donors" and "consulting." Additionally, in all three instances of Cantrell's improper use of non-personal funds for personal purposes—her relationship and travel with Vappie, alcohol, and clothing—the same person, Associate A, explicitly warned Cantrell against doing so. Many of Associate A's admonitions came during the temporal period alleged in the Count 1 conspiracy. The evidence of Cantrell's concealment of her misuse of campaign funds is of the same ilk as the underlying crime, and the stories involve the same witnesses in overlapping time frames.

"Where, as here, a defendant enters a plea of not guilty in a conspiracy case, the first prong of the *Beechum* test is satisfied because the plea 'raises the issue of intent sufficiently to justify the admissibility of extrinsic offense evidence.'" *Age*, 2021 WL 6135570 at *8 (quoting *United States v. Jimenez-Elvirez*, 862 F.3d 527, 536 (5th Cir. 2017)). Consistent with precedent that considered the admissibility of evidence regarding prior fraudulent conduct in a prosecution for fraud,

26

evidence of the campaign funds solicitation and misuse here will permit the jury to "rationally conclude that 'because the defendant had unlawful intent in the extrinsic offenses, it is less likely that [s]he had lawful intent in the present offense.'" *Crawley*, 533 F.3d at 354 (quoting *United States v. Gordon*, 780 F.2d 1165, 1173 (5th Cir. 1986)); *see also United States v. Smith*, 804 F.3d 724, 736 (5th Cir. 2015) ("We have previously recognized that an uncharged offense is relevant to intent, a proper non-character issue under Rule 404(b), if it requires the same intent as the charged offense, because evidence of the uncharged offense then lessens the likelihood that the defendant committed the charged offense with innocent intent." (internal quotations omitted)).

Finally, evidence regarding Cantrell's campaign fund solicitation, misuse, and coverup also satisfies *Beechum*'s second prong. In this case, all four factors weigh in favor of admitting evidence of Cantrell's campaign fund misuse. First, the evidence is necessary because Cantrell's intent will be the crucial issue regarding her role in the fraud conspiracy. The jury will need to decide whether her failures, including authorizing Vappie's travel reimbursement forms in which Vappie attested "that the expenses were for official business," were the result of oversight or simple mistake. Second, both the extrinsic evidence and the charged conduct concern Cantrell's pattern of attempting to conceal prior fraudulent conduct. Their overall similarity, therefore, generates sufficient probity to satisfy Rule 403. Third, the temporal proximity of the campaign funds misuse and the charged conduct favors admission. The campaign funds misuse (and coverup) for personal alcohol purchases occurred in 2020 and 2021, while Cantrell's misuse of campaign funds with her stylist started in 2017, peaked in 2021—the same year as the start of her scheme with Vappie—and continued through 2022. Meanwhile, the defendants' fraudulent conduct in the superseding indictment and subsequent attempts to hide it began in late 2021 and continued at least through 2025. Fourth, as discussed *supra*, a limiting instruction can eliminate

the possibility the jury will consider the evidence of Cantrell's campaign fund misuse for an impermissible purpose. Accordingly, the evidence is not unduly prejudicial when compared with its probative value. Because the evidence satisfies both prongs of the *Beechum* test, the Court should permit its introduction at trial.

### F. The Court may admit the evidence without a pre-trial hearing.

In *Huddleston*, the Supreme Court concluded that a court may rule on evidence seeking to be admitted under Rule 404(b) without a pre-trial hearing. *See* 485 U.S. at 687-88. Addressing the admissibility of Rule 404(b) evidence, the Court held that "the district court need not itself make a preliminary finding that the Government has proved the 'other act' by a preponderance of the evidence before it submits 'similar acts' and other Rule 404(b) evidence to the jury." *Id*. In that opinion, the Court admitted similar prior property crimes, without proof thereof by a preponderance of the evidence, to show guilty knowledge, system, and intent. *See Huddleston*, 485 U.S. at 687-88 ("[t]he text . . . [of Rule 404(b)] . . . contains no intimation . . . that *any preliminary showing* is necessary before such evidence may be introduced for a proper purpose.") (emphasis added). To meet its low burden under *Huddleston*, the government need only provide "*some evidence* that the defendant committed the bad act." *Crawley,* 533 F.3d at 354; *United States v. Gonzalez-Lira*, 936 F.2d 184, 189 (5th Cir. 1991); *see also Beechum*, 582 F.2d at 913 (where judge finds that a jury could "reasonably find" the fact to exist, that fact may be admitted).

Documentary materials comprising the "other acts" the government seeks to admit into evidence have already been made available to the defendants in discovery. As a result, a pre-trial hearing as to the admissibility of this evidence is unnecessary. In other words, the government has met its burden under *Huddleston*; it has provided evidence that the defendant is the individual who committed the "other acts" evidence at issue here, and the defendants are well aware of the nature

28

of the evidence.  Consequently, the Court can readily determine the admissibility of the evidence before trial and without conducting a pre-trial hearing.  *See, e.g.*, *Huddleston*, 485 U.S. at 690-91; *Crawley*, 533 F.3d at 354; *Dowl*, 2009 WL 1507412, at *4-7 (admitting intrinsic and extrinsic evidence without a pre-trial hearing).

## IV.    **CONCLUSION**

For the reasons above, the United States intends to present as intrinsic evidence testimony and evidence concerning Cantrell's post-indictment possession and public display of the golden NOPD ring Vappie gave her, as well as the defendants' continued possession of evidence they withheld from the grand jury.  The material is intrinsic to the charged offenses.  In the alternative, the government seeks to admit this evidence as evidence of "other acts" as provided in Rule 404(b). The government also seeks to admit information related to Cantrell's solicitation and misuse of campaign funds to purchase personal clothing and alcohol and subsequent mischaracterization of the true purpose of the funds on publicly filed reports as evidence of extrinsic "other acts" in accordance with Rule 404(b).   Consistent with existing precedent, the materials are highly probative of Cantrell's state of mind and intent and not unduly prejudicial.

Respectfully Submitted,

MICHAEL M. SIMPSON
ATTORNEY FOR THE UNITED STATES
Acting Under the Authority Conferred
by 28 U.S.C. § 515

Dated: April 1, 2026

*/s/ Jordan Ginsberg*
JORDAN GINSBERG
NICHOLAS D. MOSES
Assistant United States Attorneys
650 Poydras St., Suite 1600
New Orleans, Louisiana 70130
Telephone: (504) 680-3121

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of April 2026, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all defense counsel of record.

*/s/ Jordan Ginsberg*
JORDAN GINSBERG
Assistant United States Attorney

30